# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MARK I. COX**
The Mark I. Cox Law Office, LLC
Richmond, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Dec 05 2012, 9:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TRENTON TEAGUE, | ) | |
| Appellant-Defendant, | ) | |
| vs. | ) | No. 89A01-1202-CR-86 |
| STATE OF INDIANA, | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WAYNE CIRCUIT COURT
The Honorable David A. Kolger, Judge
Cause No. 89C01-1010-FA-010

**December 5, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Trenton Teague ("Teague") was convicted after a jury trial in Wayne Circuit Court of Class A felony burglary and Class C felony battery. Teague was sentenced to thirty-eight years for burglary and six years for battery with four years suspended. Teague appeals and argues that the trial court improperly admitted a 911 recording into evidence and that his executed sentence of forty years is inappropriate.

We affirm.

**Facts and Procedural History**

On June 20, 2010, Chelsea Saylor ("Saylor") and Teague started dating, but on September 25, 2010, their relationship ended after Saylor and Teague became embroiled in an argument in which Teague beat her, put a knife to her throat, and threatened to kill her. The incident caused Saylor a head laceration, and she visited the local hospital for treatment.

On October 4, 2010 at around 1:30 a.m., Saylor's mother, Staci Behnen ("Behnen"), fell asleep on the couch in her living room while watching television. Shortly before 3:00 a.m., Behnen woke up when a man struck her in the head with a metal bar, which appeared to Behnen to be a crowbar or tire iron. The man was wearing a dark outfit, including a black head covering, and a black bandana across his face. When Behnen pulled down the man's bandana as he continued to beat her, she recognized the man as Teague and yelled out his name. As Teague continued to beat Behnen in her face and head area with the metal bar, he ordered her to give him her purse. She attempted to block the blows with her arms until she "could not do anything."

2

Tr. p. 327. Behnen later testified that the pain was "[t]he worst probably that I've ever endured." Id. at 332.

Saylor was upstairs sleeping when she heard Behnen's screams. As Saylor came downstairs, Teague grabbed her and asked her "what are you doing in Richmond without me[?]" Id. at 491. Saylor recognized Teague from his voice and the portion of his face that was visible. Saylor ran to Behnen who was on the couch bleeding, but Teague followed and struck Saylor with the metal bar. Teague then struck Behnen repeatedly and demanded her purse. Saylor gave Teague the purse so that he would stop beating the two women. Teague then shut Saylor in a closet and told her he was "going to get a gun." Id. at 499. Through the closet door, Saylor saw Teague run out of the back door of the house. Id. at 492.

Saylor assisted Behnen out to the porch, and then ran over to their neighbor Jan Bishop's ("Bishop") house. Saylor was "hysterical" and screamed to Bishop to call 911 and tell the police that "somebody's broke into the house and beat mom up." Id. at 412. On the 911 call, Bishop described how Saylor had run to her door, and she relayed statements Saylor made about her ex-boyfriend being the perpetrator and how her mother had been beaten.

After the police and ambulance arrived, Behnen was taken to Reid Memorial Hospital where the doctor diagnosed her with facial fractures, nasal lacrimal duct transection, scalp laceration, and poly-substance drug intoxication. Id. at 434-35. Behnen told the doctor that her daughter's ex-boyfriend had beaten her. Due to her facial fractures and concern of ocular entrapment, she was later transferred to Methodist

3

Hospital in Indianapolis, the regional trauma center where patients are sent with severe injuries that cannot be treated locally. Id. at 434.

Saylor called Wilamena Mitchell ("Mitchell") around 5:00 a.m. that same morning. Mitchell was in a relationship with Teague's uncle, Jeffrey Perkins ("Perkins"). Perkins immediately tried to contact Teague, and around 6:30 a.m., Perkins spoke with Teague on the telephone. Teague asked Perkins to pick him up from the Greenwood Apartments and to take him to a bus station out of town. Perkins agreed to pick Teague up in approximately twenty minutes. Mitchell then arranged for police officers to pull Perkins and herself over after they picked up Teague. Mitchell testified that when they picked Teague up, he remarked that "[h]e needed to get out of town" and that "he was the most looked for man in Richmond at that point." Id. at 548-49. Police officers stopped the car and took Teague in for questioning.

On October 15, 2010, the State charged Teague with of Count I – Class A felony burglary; Count II – Class B felony burglary; Count III – Class A felony robbery; Count IV – Class B felony aggravated battery; Count V – Class C felony battery; and Count VI – Class C felony battery. Teague was apprehended in Florida by United States Marshalls on April 1, 2011 and extradited back to Indiana. Id. at 790.

After a four-day jury trial beginning on December 12, 2011, the jury found Teague guilty of all counts. At the sentencing hearing on February 3, 2012, the trial court merged Counts II, III, IV, and V into Count I. Teague was sentenced to thirty-eight years on Count I and to a consecutive six years with four years suspended on Count VI.

Teague now appeals.

4

## I. Admission of 911 Call

Teague claims the trial court improperly admitted the 911 recording in which Bishop relayed Saylor's statements. A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. Lehman v. State, 926 N.E.2d 35, 37 (Ind. Ct. App. 2010), trans. denied (citing Iqbal v. State, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004)). An abuse of discretion occurs if the trial court's decision is "clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law." Boatner v. State, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under a hearsay exception. Ind. R. Evid. 801; see also Jenkins v. State, 725 N.E.2d 66, 68 (Ind. 2000) (citing Ind. R. Evid. 802). If a statement involves hearsay within hearsay, also known as multiple hearsay or double hearsay, the statement may still be admitted if "each layer of hearsay" qualifies "under an exception to the hearsay rule[.]" Palacios v. State, 926 N.E.2d 1026, 1030 (Ind. Ct. App. 2010); see also Ind. R. Evid. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

Here, the 911 recording involves multiple hearsay because Bishop relayed statements made by Saylor. Therefore, under Rule 805, Saylor's statements to Bishop and Bishop's statements to the 911 operator must both fall within a hearsay exception to be admissible. See Palacios, 926 N.E.2d at 1030.

A. *Bishop's Statements as Excited Utterance*

5

Teague concedes that Saylor's statements to Bishop were an excited utterance. Appellant's Br. at 9. However, Teague argues that Bishop's statements to the 911 operator were not an excited utterance and hence were inadmissible hearsay. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" and is not excluded by the hearsay rule. Ind. R. Evid. 803(2). To meet the excited utterance exception, three elements must be present: (1) a "startling event or condition" has occurred; (2) the declarant made a statement while "under the stress or excitement caused by the event or condition;" and (3) the statement was "related to the event or condition." Lawrence v. State, 959 N.E.2d 385, 389 (Ind. Ct. App. 2012), trans. denied.

This test is not "mechanical" and admissibility turns "on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications." Sandefur v. State, 945 N.E.2d 785, 788 (Ind. Ct. App. 2011). The lapse of time is not dispositive, but if a statement is made long after a startling event, it is usually "less likely to be an excited utterance." Boatner, 934 N.E.2d at 186. "The heart of the inquiry is whether the declarant was incapable of thoughtful reflection." Jones v. State, 800 N.E.2d 624, 627 (Ind. Ct. App. 2003).

Here, a bloodied Saylor came to Bishop's house in the middle of the night distraught and screaming that her mother had been beaten up. Bishop could also hear Behnen screaming from her own porch next door. Bishop immediately called 911 and answered the operator's questions. An excited utterance can be made in response to a question so long as the statement is unrehearsed and is made under the stress of

6

excitement from the event. Yamobi v. State, 672 N.E.2d 1344, 1346 (Ind. 1996) ("A declaration does not lack spontaneity simply because it was an answer to a question."). During the 911 call, Saylor could be heard crying in the background, and Bishop told the operator that she was going to remain at her own house, because she was not certain whether the perpetrators were still in Behnen's house. Throughout the conversation, Bishop had no time to reflect before making her statements. For all of these reasons, we conclude that Saylor's arrival at her home was a startling event and that Bishop made her statements regarding the incident to the 911 operator while she was under the stress of this event.

In Noojin v. State, our supreme court held that "it is assumed, although not specifically stated in the rule, that an excited utterance must be based on the declarant's personal knowledge[.]" 730 N.E.2d 672, 677 (Ind. 2000). However, Noojin involved a situation where no one had personal knowledge of the underlying incident, rather the declarant's statements regarding the incident were based on "conjecture[.]" Id. Thus, it is a matter of first impression for our court whether a 911 recording that involves statements by a caller that were relayed from a victim are admissible where the victim had personal knowledge of the underlying incident but the caller did not. This issue has been addressed in other jurisdictions. See e.g., Williamson v. State, 707 A.2d 350, 353 (Del. 1998) (holding that the 911 call was admissible as an excited utterance where the 911 caller was relaying the victim's statements to the 911 operator); cf. Bemis v. Edwards, 45 F.3d 1369, 1373 (9th Cir. 1995) (holding that statements made during a 911 call were inadmissible where the 911 caller did not witness the events he described but

7

rather relayed the observations of other people because the caller did not have personal knowledge of the underlying incident).

Here, Bishop did not have personal knowledge of the underlying incident Saylor described, but she did have personal knowledge of, and was responding to, the startling event or condition that came to her home in the middle of the night in the person of a bloodied Saylor screaming for help. She heard Behnen moaning in pain from her injuries on her front porch next door. The 911 call confirms that Bishop was assiduous in relaying the operator's questions to Saylor and Saylor's answers in return. For all of these reasons, we conclude that the facts and circumstances before us bear sufficient indicia of reliability, the hallmark of all hearsay exceptions. We further conclude that these facts and circumstances are sufficient to meet all of the requirements of an excited utterance. Thus, we hold that Bishop's statements relaying Saylor's answers to the 911 operator are admissible as excited utterances. [1]

B. *Harmless Error*

Even if the trial court erred in admitting the 911 call into evidence, we will not reverse the trial court's conviction if the error was harmless. Turner v. State, 953 N.E.2d 1039, 1059 (Ind. 2011). The error is harmless if there is "substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction." Id. "Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party." Id. If the erroneously admitted evidence was cumulative, the admission is

---

[1] Teague did not raise a Sixth Amendment Confrontation Clause issue on appeal.

harmless error for which we will not reverse a conviction. <u>Lehman v. State</u>, 926 N.E.2d 35, 37 (Ind. Ct. App. 2010).

Here, both Behnen and Saylor identified Teague at trial as the perpetrator. Furthermore, Dr. Michael Smith testified, without objection from the defense, that Behnen told him her daughter's ex-boyfriend had beaten her. Tr. p. 441. Behnen's and Saylor's testimony in court along with Behnen's prior statements to the doctor serve as "substantial independent evidence of guilt" and satisfy us that "there is no substantial likelihood the challenged evidence contributed to the conviction." <u>See</u> <u>Turner</u>, 953 N.E.2d at 1059. The 911 recording was merely cumulative evidence; therefore, even if it was improperly admitted, the error was harmless.

## II. Sentencing

Teague claims that the sentence imposed by the trial court is inappropriate in light of the nature of his offense and of his character. Under Indiana Appellate Rule 7(B), we may "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Although we may review and revise a sentence, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." <u>Cardwell v. State</u>, 895 N.E.2d 1219, 1225 (Ind. 2008). We must give "deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give due consideration to that decision and because we understand and recognize the

9

unique perspective a trial court brings to its sentencing decisions." Trainor v. State, 950 N.E.2d 352, 355-56 (Ind. Ct. App. 2011), trans. denied (quoting Stewart v. State, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007)) (internal quotation marks omitted).

In reviewing the appropriateness of a sentence, we consider "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." Cardwell, 895 N.E.2d at 1224. We also focus on the aggregate sentence rather than the "'consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" Heinzman v. State, 970 N.E.2d 214, 228 (Ind. Ct. App. 2012) (quoting Cardwell, 895 N.E.2d at 1225). The defendant has the burden to persuade us "that the sentence imposed by the trial court is inappropriate." Id. (citing Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006)).

Teague committed Class A felony burglary, for which the sentencing range is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4. He also committed Class C felony battery, for which the sentencing range is two to eight years with an advisory sentence of four years. Ind. Code § 35-50-2-6. Regarding both counts, but particularly in regard to Count I, the trial court found that the aggravating circumstances outweighed the mitigating factors. Teague was sentenced to the Indiana Department of Corrections for consecutive sentences of thirty-eight years for burglary and six years for battery with four years suspended. Thus, neither sentence even meets the statutory maximum sentence.

Regarding the nature of the offense, the trial court noted that "the particular nature and circumstances of this crime . . . as they were perpetrated upon Staci Behnen by the

10

defendant is significantly more heinous, callous and reprehensible than what is called for by the statute." Tr. p. 811. Teague started to beat Behnen with a metal bar while she was still asleep, and the beating occurred, at least in part, in the presence or hearing of Saylor, who was less than eighteen years old at the time of the burglary. Furthermore, Teague also beat Saylor with the metal bar, and then returned to beat Behnen again, who "could not do anything" to defend herself and was already "bleeding out her head." Id. at 491. Behnen suffered such severe injuries that she had to be transferred to the regional trauma center. Due to the beating, she had facial fractures, nasal lacrimal duct transection, and a scalp laceration. She has undergone multiple surgeries. Thus, we conclude that the nature of Teague's crimes support the trial court's sentencing judgment.

Next, we consider the character of the offender. In looking at "a defendant's prior criminal history in determining whether to impose a sentence enhancement[,]" we look at "'the gravity, nature and number of prior offenses as they relate to the current offense.'" Smith v. State, 889 N.E.2d 261, 263 (Ind. 2008) (quoting Ruiz v. State, 818 N.E.2d 927, 929 (Ind. 2004)). While we acknowledge that Teague had not previously been convicted of a felony, he had four prior misdemeanor convictions, one of which was Class A misdemeanor battery, which is directly related to both counts for which he was convicted in this case. Furthermore, at trial Saylor testified that on September 25, 2010, about a week prior to the incident in question, Teague had beaten her, and that she was treated at the hospital for a head laceration.

Moreover, as the trial court noted in its sentencing statement, "[Teague] was ordered by this Court not to have any contact with Chelsea Saylor and he did. He was

ordered to pay child support and he didn't." Tr. p. 809. At the time of sentencing, Teague had approximately $17,000 in arrears for two of his children and had failed to appear for the child support hearings. Furthermore, Teague fled Indiana to avoid prosecution in this matter and had to be extradited back from Florida for trial. All of this reflects poorly on Teague's character.

Giving due consideration to the trial court's sentencing discretion, and considering the nature of the offense and Teague's character, we conclude that Teague's forty-year executed sentence is appropriate.

## Conclusion

The trial court did not abuse its discretion by admitting the 911 call, and Teague's aggregate, executed sentence of forty years is appropriate.

Affirmed.

VAIDIK, J., concurs.
BARNES, J., concurs in result.