MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 10 2016, 8:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thad Dale Stewart, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 10, 2016

Court of Appeals Case No.
45A03-1506-CR-553

Appeal from the
Lake Superior Court

The Honorable
Clarence D. Murray, Judge

Trial Court Cause No.
45G02-1005-FA-17

**Kirsch, Judge.**

Thad Dale Stewart, Jr. ("Stewart") was convicted after a jury trial of two counts of child molesting,[1] each as a Class A felony, and was sentenced to an aggregate ninety-year sentence. On appeal, he raises the following restated issues for our review:

> I. Whether the trial court committed reversible error when it restricted questioning of the child witnesses regarding possible exposure to sexual matters;

> II. Whether the trial court abused its discretion when it allowed a comfort dog to be present during the child witnesses' testimony;

> III. Whether the trial court abused its discretion in admitting the recording of a police interview with the victim as a recorded recollection;

> IV. Whether the trial court abused its discretion when it allowed an expert witness to testify as to his professional opinion as a sexual assault examiner; and

> V. Whether the trial court abused its discretion when it allowed testimony regarding the victims' disclosures to their mother and a school counselor to be admitted as excited utterances.

We affirm.

---

[1] *See* Ind. Code § 35-42-4-3(a). We note that, effective July 1, 2014, a new version of this criminal statute was enacted. Because Stewart committed his crimes prior to July 1, 2014, we will apply the statute in effect at the time he committed his crimes.

## Facts and Procedural History

[3] In 2003, Stewart married Amber Hardesty ("Mother"),[2] and they are the parents of twin sons, L.S. and C.S., who were born on May 1, 2002. Starting in January 2003, Mother worked full time at a bakery in Michigan City, Indiana. The family moved into a home in Lake Station, Indiana in 2007. While they lived in the house, Mother would leave for work at approximately 4:00 or 4:30 a.m., and Stewart would be responsible for getting the boys ready for school in the morning. L.S. was a grade behind C.S. because he has a speech impediment, and it was later discovered that L.S. had ADHD as well. From May 2009 to April 2010, L.S. and C.S. were in first and second grade, respectively.

[4] By 2009, Stewart was spending a lot of time in the garage and not spending much time inside the house when Mother was home at night. Sometimes, Stewart would not come in to bed and would spend the night in the garage. During that time, Stewart was not working, and Mother was working a lot of hours. During the time period from May 2009 to April 2010, the relationship between Mother and Stewart was not sexually active, and Mother described it as more of a roommate situation. In addition to getting the boys to school in the mornings, Stewart was responsible for the boys all summer while Mother

---

[2] Amber Hardesty was remarried after her divorce from Stewart, and Hardesty is her new, married name.

was working. Mother believed that Stewart was spending time with the boys in positive ways by going to the lake and fishing.

[5] At some point during this time period, Mother took one of the boys to the doctor because he was complaining of blood in his stool. After an examination, the doctor stated it was probably just from constipation. At age seven, L.S. began having nightmares in the middle of the night and would always want to go with Mother whenever she left the house.

[6] Around the time that L.S. was in kindergarten or first grade, Stewart began waking him up at night and taking him to the upstairs living room. Stewart would get on the couch and pull his pants down to his knees. Stewart directed L.S. to get on the couch and told him to bend down. Stewart would then grab L.S.'s head and pushed his head up and down so that L.S.'s mouth was on Stewart's penis. Stewart told L.S. to move his tongue from side to side until Stewart's penis became erect. L.S. would tell Stewart that he did not want to do this. On one instance, Stewart ejaculated into L.S.'s mouth and made L.S. swallow it, telling him it would make L.S.'s muscles "stronger." *Tr.* at 181-82. On other occasions, Stewart would have L.S. pull down his pants, and Stewart would "put it up [L.S.'s] butt." *Id.* at 180. L.S. said that it hurt when Stewart did this and that Stewart would not stop even when L.S. told him it hurt. Stewart also had L.S. put lotion on his penis on some occasions.

[7] During these molestations, Stewart would say that he wished L.S. was a girl. L.S. stated that these encounters with Stewart happened multiple times, and

that in addition to the living room, it also occurred once in the garage and once at the lake when they were canoeing. It happened mostly at night, but occurred once in the daytime too. Stewart did these things to L.S. when Mother was at work. L.S. was not sure how many times Stewart had put his penis in L.S.'s mouth or butt, but said it was probably more than ten times. *Id*. at 187-88. Stewart told L.S. not to tell anyone about what he was doing because it was their "little secret." *Id*. at 182. During the daytime occurrence, Stewart showed both L.S. and C.S. a sexually explicit video in the garage.

[8]  At the same time Stewart was doing these things to L.S., he was also waking C.S. up at night. After waking the boys, C.S. said that Stewart would take them to the living room on the couch, and occasionally to Stewart's bedroom. C.S. said that Stewart would pull down his boxers and have either C.S. or L.S. "suck his penis." *Id*. at 250. C.S. stated that Stewart's penis was hard when he saw it. *Id*. at 250-51. During one of these times, Stewart ejaculated in C.S.'s mouth, and C.S. began to gag. Stewart allowed C.S. to go to the bathroom, where C.S. tried to throw up, but Stewart told him to hurry up. When Mother arrived home shortly thereafter, Stewart stopped. Sometimes, Stewart would also "stick it up [C.S.'s] butt," referring to Stewart's penis. *Id*. at 254. C.S. told Stewart that this hurt, but Stewart did not stop. C.S. also witnessed Stewart make L.S. "suck his penis" and "stick it up [L.S.'s] butt." *Id*. at 255. On one occasion, Stewart sprayed something on C.S.'s tongue that made it numb. *Id*. at 256. Stewart also showed the boys "Girls Gone Wild" videos. *Id*. at 255.

Stewart made the boys promise not to tell anyone and said, "[D]o not tell anyone or else." *Id*. at 254.

[9] On April 21, 2010, L.S. came to Mother teary-eyed, acting nervous, kind of scared, and like he wanted to say something. Mother was alone in her bedroom, and Stewart was in the garage with friends at the time. L.S. told Mother that Stewart had a secret, "that he's got a girlfriend." *Id*. at 95. L.S. then said that Stewart had another secret and stated that "he was doing it to C.S." *Id*. Mother called C.S. into the room and asked him if Stewart had done anything to him, and C.S. got mad at L.S. and started crying. He said, "It's a secret, you're not supposed to say anything" and told L.S. to shut up. *Id*. at 95-96. C.S. did not want to talk to Mother at that time, so she just comforted him. She told the boys that she would "take care of everything tomorrow." *Id*. at 96. Mother did not confront Stewart that night because she was afraid of his reaction.

[10] The next morning, Mother went to work, and the boys went to school. Mother called the school the next morning and spoke with the school counselor, Brianne Horn ("Horn"). Mother described what L.S. had said and C.S.'s reaction. Horn removed the boys separately from class and spoke with them. When she spoke with L.S., he told her that "he had seen [Stewart] put his private into [C.S.'s] bottom." *Id.* at 217. During C.S.'s interview with Horn, he was nervous, afraid, scratching his forehead, and crying. He told Horn that Stewart "would put his private area into his mouth and it would spit." *Id*. at 224. C.S. was not able to tell Horn how long this had been occurring. He also

told Horn that Stewart sprayed something on his tongue to make it numb and that he was made to swallow it when Stewart's "private . . . spit." *Id.* at 225. C.S. also relayed that Stewart did "everything to [L.S.], but . . . not put his private area in his butt." *Id.* at 226. C.S. told Horn that he was afraid that Stewart "would find out." *Id.* at 227.

[11] As required by law, Horn called the Department of Child Services ("DCS"), and the boys spoke with someone from DCS. A few days later, someone from DCS came to the house and told Mother that Stewart had to leave the home. When Stewart's Mother was picking up some of his belongings, she removed several pornographic videos that Mother was not aware were there. On May 7, 2010, the State charged Stewart with two counts of Class A felony child molesting and two counts of Class C felony child molesting.

[12] On July 28, 2010, it was arranged by DCS for the boys to be examined by Dr. Edwin Udani ("Dr. Udani"). Dr. Udani has professional training regarding examining sexual abuse victims and has examined sexually abused children at least once a week since approximately 1993. Dr. Udani has also received special training in interviewing children, and such training emphasized that taking a history from the patient can be more important than the physical examination. Dr. Udani obtained a history from the boys separately and without Mother present. While questioning the boys, L.S. told the doctor that Stewart put his "wienie in [L.S.'s] mouth and . . . bottom." *Id.* at 299. L.S. could not specify how many times this occurred, but "said about seven, eight, or ten." *Id.* L.S. told Dr. Udani that these things happened in his room, the

front room, sometimes in the garage, and sometimes in Mother's room. C.S. told Dr. Udani that Stewart "put his pee-pee in [C.S.'s] mouth." *Id.* at 309. C.S. also "related a history of penis inserted [sic]," which hurt and "said that it was painful when he had some bowel movements." *Id.* at 310. Dr. Udani performed physical examinations on the boys that resulted in no abnormal findings, noting that most of the sexual abuse examinations that he performed had negative results. At trial, Dr. Udani testified that his impression was "[h]igh suspicion of sexual abuse based on explicit statements" of the boys. *Id.* at 344.

[13] A jury trial began on March 30, 2015. The boys were twelve years old at the time of the trial. When they testified, the trial court allowed a comfort dog to be present in the courtroom. Stewart objected to the comfort dog being present, arguing that the jury may construe it as the boys needing to be protected from Stewart, and requested an admonishment, which the trial court gave. When L.S. testified, the trial court admonished the jury as follows:

> All right, ladies and gentlemen. This next witness is one of the children. There will be a dog coming in with the child. We refer to it as a comfort item. The dog is not coming in for purposes of protection or security. It's to put the child at ease. There will also be a handler for the dog.

*Id.* at 163. When C.S. testified, the following admonishment was given to the jury:

> With respect to the dog, as I indicated earlier, the dog is a comfort item. It's not here for protection or security, but to make

the witness feel more at ease. It's permitted by Indiana law for a child witness to bring a comfort item into the court, a stuffed animal, a live animal, so that's the purpose of the dog.

*Id.* at 292.

[14] At the conclusion of the trial, the jury found Stewart guilty as charged. The trial court entered judgment only as to the two Class A felony child molesting counts. Stewart was sentenced to forty-five years for each conviction, and the sentences were ordered to run consecutive to each other for an aggregate sentence of ninety years executed. Stewart now appeals.

## Discussion and Decision

## I. Restriction on Questioning

[15] Stewart argues that the trial court abused its discretion when it prohibited him from inquiring on cross-examination into other ways in which L.S. and C.S. could have learned about sexual activity. "To preserve a trial court's allegedly erroneous exclusion of evidence for appeal, it is 'appropriate and necessary for counsel to make an offer of proof on cross-examination if [he] believes the trial court has limited a line of questioning or has erroneously sustained an objection by opposing counsel.'" *King v. State*, 799 N.E.2d 42, 48 (Ind. Ct. App. 2003) (quoting *Arhelger v. State,* 714 N.E.2d 659, 666 (Ind. Ct. App. 1999)), *trans. denied*, *cert. denied*, 543 U.S. 817 (2003); *see also* Ind. Evidence Rule 103. The offer of proof may be made immediately upon the judge's sustaining of opposing counsel's objection, or before the judge rules on the objection. *King*,

799 N.E.2d at 48. The offer must (1) make the substance of the excluded evidence or testimony clear to the court, (2) identify the grounds for admission of the testimony, and (3) identify the relevance of the testimony. *Id.* However, Indiana Evidence Rule 103(a)(2) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked."

[16] In the present case, the State filed a motion in limine to prohibit the defense from asking whether Mother had an older son. Defense counsel responded that he did not intend to question Mother about custody of the child, but instead, wanted to inquire into whether, during the time the older son spent with L.S. and C.S., they might have discussed sex, which would provide another potential source of information of a sexual nature. *Tr.* at 32-33. The trial court asked if defense had a reasonable belief that the older brother had talked to the younger children about sex, to which defense counsel responded yes. *Id.* at 33. Defense counsel admitted such topic was not brought up in depositions, but relied on the fact that L.S. and C.S. had spent time with the older brother, so explicit sexual talk could have happened. *Id.* at 34. At that time, the trial court decided to allow questions as to who resided in the home, but would only allow further questioning about whether they spoke to their older brother about sex if the boys "make mention" during their testimony that "they spoke to the other half-brother about these acts." *Id.* at 35-36. The trial court made it clear that

his rulings at that time were preliminary. However, during questioning of L.S. and C.S., Stewart did not pursue this topic in questioning the boys, and there was no ruling during the trial that excluded any testimony and no offer to prove. Therefore, Stewart has not preserved this issue for appeal. *Carter v. State*, 932 N.E.2d 1284, 1287 (2010) (failure to make an offer to prove results in waiver). Nor has he shown any prejudice as he did not pursue any questioning regarding the older brother during his questioning of L.S. and C.S.

[17] Although Stewart did not pursue any questioning regarding the older brother, he did question L.S. about his contact with his teenage uncles who were a few years older than L.S. and C.S. During cross-examination of L.S., defense counsel inquired as to the time that he spent with these uncles, to which L.S. stated that they sometimes spent time together, but that he did not spend much time over at his grandma's where the uncles lived. *Id*. at 195. L.S. also testified that he did not remember any occurrences of anyone talking to him about sexual things when he was seven or eight years old. *Id*. at 199. We, therefore, find that Stewart has not shown any prejudice regarding the trial court's motion in limine, and the trial court did not abuse its discretion in limiting his questioning.

## II. Comfort Dog

[18] Stewart argues that the trial court erred in allowing a comfort dog to be present when L.S. and C.S. testified. Initially, we note that Stewart has waived this issue because his argument on appeal is different from his reason for objection

at trial. A defendant may not argue one ground for objection at trial and then raise new grounds on appeal. *Addison v. State*, 962 N.E.2d 1202, 1211 (Ind. 2012). In such circumstances, the issue is waived. *Id*. At trial, Stewart argued against allowing the comfort dog to accompany the boys during their testimony because the jury could construe the dog as implying "that these children are afraid or that they need to be protected from [Stewart]" and that "[i]t may see[m] to be more as if [sic] guarding them, protecting them from . . . Stewart." *Tr*. at 76. Now, on appeal, Stewart is arguing that the trial court erred in allowing the comfort dog to be present because "the presence of the dog underscored the boys' age and innocence" and "emphasized the credibility of their testimony." *Appellant's Br*. at 12. His contention is, therefore, waived as he is asserting it for the first time on appeal.

[19]     Waiver notwithstanding, we find that the trial court did not err in allowing the comfort dog in the courtroom when L.S. and C.S. testified. We leave to the trial court decisions regarding the orderly procedure of a trial. *Vasquez v. State*, 868 N.E.2d 473, 476 (Ind. 2007). Where a trial court has made a decision regarding a violation or sanction, we will reverse only if there is clear error and resulting prejudice. *Bradley v. State,* 770 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied.* Here, Stewart requested an admonishment to the jury as to the purpose of the dog, which the trial court granted. The trial court gave an admonishment at the time each boy testified, and Stewart did not object to these admonishments or object to the presence of the dog at the time the boys testified. Stewart is also not able to demonstrate any prejudice he suffered due

to the dog being present in the courtroom. We conclude that the trial court did not err in allowing the comfort dog to accompany L.S. and C.S. when each testified.

## III. Recorded Recollection

[20] Stewart argues that the trial court abused its discretion when it allowed a video recording of L.S.'s interview with a detective to be admitted as a recorded recollection. We review a trial court's decision to admit evidence for an abuse of discretion. *Collins v. State,* 826 N.E.2d 671, 677 (Ind. Ct. App. 2005), *trans. denied, cert. denied,* 546 U.S. 1108 (2006). We will find an abuse of discretion when its decision is "clearly against the logic and effect of the facts and circumstances before it." *Id.* However, even if we find an abuse of discretion in the admission of particular evidence, we will not reverse unless the defendant's substantial rights have been affected. Evid. R. 103(a); *Pruitt v. State,* 834 N.E.2d 90, 117 (Ind.2005), *cert. denied,* 548 U.S. 910 (2006).

[21] Stewart contends the trial court abused its discretion when it admitted the video recording of the interview between L.S. and Detective Jeremy Kalvaitis ("Detective Kalvaitis") of the Lake County Sheriff's Department into evidence. He specifically claims that the recording should not have been admitted as a recorded recollection because L.S. had previously testified extensively and completely regarding the sexual abuse allegations. Stewart asserts that L.S. was not shown to have insufficient recollection of the events, and therefore, the State failed to lay a proper foundation for the admission of the video recording.

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. Evid. R. 801(c). Hearsay evidence is generally inadmissible pursuant to Evidence Rule 802; however, Evidence Rule 803 enumerates exceptions to the hearsay rule. A recorded recollection, defined in Evidence Rule 803(5), is one such exception to the hearsay rule and provides:

> A record that: (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and (C) accurately reflects the witness's knowledge. If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

Before a statement can be admitted under the recorded recollection hearsay exception, certain foundational requirements must be met, including some acknowledgment that the statement was accurate when it was made. *Ballard v. State*, 877 N.E.2d 860, 862 (Ind. Ct. App. 2007). A trial court should not admit a witness's statement into evidence when the witness cannot vouch for the accuracy of the statement nor remember having made the statement. *Id.* We employ a three-tiered approach to determine the use of recorded recollections: "(1) the unaided testimony of a witness is preferred; (2) if the unaided testimony is not available, the law prefers refreshed recollection; and (3) if the witness's recollection cannot be revived, 'the recorded recollection exception to hearsay Rule 803(5) may be available to admit the document which contains the witness's prior knowledge of the facts in question.'" *Marcum v. State*, 772

N.E.2d 998, 1002 (Ind. Ct. App. 2002) (quoting *Smith v. State*, 719 N.E.2d 1289, 1290-91 (Ind. Ct. App. 1999)).

[24]   Here, the State sought to admit a video recording of the interview between L.S. and Detective Kalvaitis, which occurred on May 5, 2010, a couple of weeks after L.S. first disclosed the abuse by Stewart. Before the recording was admitted, it was shown, through questioning of L.S., that the recording related to the abuse by Stewart, that the recorded interview was made when the matter was fresh in L.S.'s memory as it occurred only about two weeks after he first disclosed the abuse, and that L.S. was telling the truth when he spoke with Detective Kalvaitis. It was also shown that although L.S. was able to testify to aspects of the abuse that took place at trial, it had been five years since the abuse had happened, and L.S. did not fully and accurately remember all aspects of the abuse that had been fresh in his mind when he was interviewed by Detective Kalvaitis. At trial, L.S. could no longer remember speaking with Horn about the abuse and did not remember going to a doctor after he spoke with the police. *Tr.* at 186, 188. L.S. was not able to remember whether Stewart's penis was erect when he saw it initially or when Stewart made him put lotion on it. *Id.* at 178, 189-90. He could also not recall the things Stewart would say to him while the abuse was occurring, including what Stewart would say when he had L.S. put lotion on his penis. *Id.* at 181, 189. Although L.S. remembered canoeing with Stewart, he did not remember going fishing with Stewart at the lake near their house. *Id.* at 173.

The recording was much closer in time to the abuse that occurred, and L.S.'s memory was fresher at the time the recording was made. We conclude that the video recording satisfied the requirements of Evidence Rule 803(5) and qualified as a recorded recollection. The trial court did not abuse its discretion in allowing the recording to be admitted into evidence at the trial.

## IV. Doctor's Statement

Stewart contends that the trial court abused its discretion when it allowed Dr. Udani to testify as to his opinion formed after his examination of the boys. A trial court is accorded discretion in ruling on the relevancy and admissibility of expert testimony. *Schmidt v. State*, 816 N.E.2d 925, 937 (Ind. Ct. App. 2004) (citing *Carnahan v. State,* 681 N.E.2d 1164, 1166 (Ind. Ct. App. 1997)), *trans. denied*. We will not reverse a trial court's decision absent an abuse of discretion, which occurs where the decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

Stewart argues that the trial court abused its discretion in permitting Dr. Udani to testify that he had a high suspicion that sexual abuse occurred based on the statements by L.S. and C.S. Stewart asserts it was an abuse of discretion to allow the doctor to give an opinion regarding the credibility of the children because such opinion was outside of his field of expertise. He contends that allowing such an opinion by Dr. Udani was error because it was done without proper foundation because the doctor was not a clinical psychologist, did not identify any studies upon which he based his opinion, and did not provide

evidence of common behaviors of child abuse victims. Stewart further claims that such an opinion by Dr. Udani constituted an opinion regarding the truth of allegations and was impermissible vouching.

[28] Indiana Evidence Rule 702(a) provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

In construing this rule, only one of these characteristics—knowledge, skill, experience, training, or education—is necessary to qualify an individual as an expert. *Lyons v. State*, 976 N.E.2d 137, 141-42 (Ind. Ct. App. 2012).

[29] Our Supreme Court has determined that the "specialized knowledge" set forth in Evidence Rule 702(a) is not necessarily scientific knowledge, and it need not be proven reliable by means of "scientific principles." *Malinski v. State,* 794 N.E.2d 1071, 1084 (Ind. 2003). Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence. *Lyons*, 976 N.E.2d at 142 (citing *Turner v. State,* 953 N.E.2d 1039, 1050 (Ind. 2011)). Under Evidence Rule 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

[30]    In the present case, Dr. Udani was qualified as an expert witness. He is a doctor with special professional training regarding examining sexual abuse victims and has examined sexually abused children at least once a week since approximately 1993. *Tr.* at 287. Dr. Udani's specialized training included how to interview children, and this training emphasized that taking a history from the patient can be more important than the physical examination. *Id.* at 292. When he examined L.S. and C.S., Dr. Udani obtained a history from the boys separately and without Mother present as was his process for interviewing children. *Id.* Because Dr. Udani's physical examination did not produce any abnormal findings, he testified that he did not make any findings in the case. *Id.* at 344. He did, however, testify to his impression of a "[h]igh suspicion of sexual abuse based on explicit statements" of the boys. *Id.* Dr. Udani did not testify as to his opinion about the credibility of either boy's statements or the ultimate issue of Stewart's guilt. Under Evidence Rule 702(a), Dr. Udani was qualified as an expert, and under Evidence Rule 703, he was able to base his impression on facts that he had been made aware of through the case. We conclude that the trial court did not abuse its discretion when it admitted Dr. Udani's impression formed pursuant to his examination of the boys.

## V. Excited Utterances

[31]    A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Lehman v. State,* 926 N.E.2d 35, 37 (Ind. Ct. App. 2010), *trans. denied*. An abuse of discretion occurs if the trial court's decision is "clearly against the logic and effect of the facts and circumstances before the court, or if

the court has misinterpreted the law." *Teague v. State*, 978 N.E.2d 1183, 1187 (Ind. Ct. App. 2012).

[32]     Stewart contends that the trial court abused its discretion when it admitted the testimony of Mother and Horn regarding statements made by the boys as excited utterances. Stewart argues that these statements should not have been allowed into evidence because there was no showing that they were made by the boys while under the stress of excitement caused by the abuse. He asserts there was no indication of when the abuse had occurred relative to the dates the statements were made, April 21 and 22, 2010. Stewart alleges that allowing these statements into evidence resulted in prejudice to him because each additional recitation of the boys' allegations reemphasized them to the jury and added to the boys' credibility.

[33]     Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under a hearsay exception. Ind. Evidence Rule 801; Evid. R. 802. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused" and is not excluded by the hearsay rule. Evid. R. 803(2). "To meet the excited utterance exception, three elements must be present: (1) a 'startling event or condition' has occurred; (2) the declarant made a statement while 'under the stress or excitement caused by the event or condition;' and (3) the statement was 'related to the event or condition.'" *Teague*, 978 N.E.2d at 1187 (quoting *Lawrence v. State,* 959 N.E.2d 385, 389 (Ind. Ct. App. 2012), *trans. denied*). This test is not a mechanical test, and

admissibility turns on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications. *Sandefur v. State,* 945 N.E.2d 785, 788 (Ind. Ct. App. 2011). The amount of time that has passed is not dispositive, but if a statement is made long after a startling event, it is usually "less likely to be an excited utterance." *Id.* The heart of the inquiry is whether the declarant was incapable of thoughtful reflection. *Id.*

[34] Stewart contends that statements by Mother as to what L.S. told her on the evening of April 21, 2010, when he disclosed the abuse by Stewart, and testimony by Horn regarding what C.S. disclosed to her when she met with him on April 22, 2010 were improperly admitted as excited utterances. Although Stewart concedes that the allegations contained in the statements at issue constitute a startling event for the boys and that such statements are related to the startling event, he asserts that there was no showing that these statements were made by the boys while under the stress of excitement caused by the event. We agree. Although there was evidence that the abuse of the boys was ongoing, there was no evidence indicating when the abuse occurred relative to the statements made on April 21 and 22, 2010. Further, Mother testified that L.S. was "kind of scared," "nervous," and "a little teary eyed" when he made the statement at issue to her. *Tr.* at 94. Horn testified that C.S. "became nervous," "would scratch his forehead," and cried when he made the statements at issue to her. *Id.* at 218. Although these behaviors by L.S. and C.S. demonstrate some distress at the time they made the statements, it was not

shown that these behaviors were due to the stress or excitement caused by the event or condition and not just the stress of talking about an uncomfortable topic with their mother or being called in to talk with the school counselor. While we do not wish to discount the distress such abuse causes the victims and the additional stress of making such an emotional disclosure, we do not find that there was a sufficient showing that L.S. and C.S. were under the stress or excitement caused by the abuse when they made their statements to Mother and to Horn, particularly when there was no indication as to when the abuse occurred relative to the time the statements were made.

[35] However, although we find that it was error to admit such statements as excited utterances, we will not reverse the trial court's conviction if the error was harmless. *Teague*, 978 N.E.2d at 1188 (citing *Turner,* 953 N.E.2d at 1039). The error is harmless if there is substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* at 1189. If the erroneously admitted evidence was cumulative, the admission is harmless error for which we will not reverse a conviction. *Lehman,* 926 N.E.2d at 37.

[36] Here, both L.S. and C.S. testified at trial to the abuse they were subjected to by Stewart. Further, Dr. Udani testified regarding what the boys told him at the time he examined them about the abuse by Stewart. Additionally, a video recording of L.S.'s interview with Detective Kalvaitis, in which L.S. talked about the abuse was also properly admitted at trial. We find that the challenged

testimony by Mother and Horn was merely cumulative evidence, and therefore, even if improperly admitted, such error was harmless.

[37] Affirmed.

[38] Mathias, J., and Brown, J., concur.