

**FILED**

Jun 12 2019, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan M. Gardner
Deputy Public Defender
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cody A. Stinson, | June 12, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 18A-CR-2925 |
| v. | Appeal from the Allen Superior Court |
| State of Indiana, | The Honorable Frances C. Gull, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 02D05-1801-F3-1 |

**Kirsch, Judge.**

[1] Cody A. Stinson ("Stinson") was convicted following a jury trial of attempted murder,[1] a Level 1 felony, and battery with a deadly weapon,[2] as a Level 5 felony, and he was adjudicated to be an habitual offender.[3] On appeal, he raises the following restated issues:

> I. Whether the trial court abused its discretion in admitting statements under the excited utterance exception to the rule against hearsay thereby prejudicing Stinson's right to a fair trial; and

> II. Whether the trial court abused its discretion when it allowed the State to ask the victim leading questions during direct examination.

We affirm.

## Facts and Procedural History

[2] Around 10 p.m. on December 31, 2017, Stinson went to a New Year's Eve party with his girlfriend Spring Applegate ("Applegate"), half-brother Shane Hobbs ("Hobbs"), and best friend Mark McVay ("McVay"). The four friends drank alcohol at the party, and after McVay jumped over the bar and broke some glasses, the host asked them to leave. The friends got into their car and headed toward Hobbs's Allen County home, stopping at Taco Bell along the

---

[1] *See* Ind. Code §§ 35-42-1-1, 35-41-5-1.

[2] *See* Ind. Code § 35-42-2-1(g).

[3] *See* Ind. Code § 35-50-2-8.

way. Hobbs was driving the car, McVay sat in the passenger seat, and Applegate and Stinson sat in the back seat. *Tr. Vol. 3* at 38.

[3] During the drive, Stinson and Applegate began fighting, and Hobbs and McVay told them to stop. A minute or two later, Stinson reached over the front seat toward McVay. Hobbs then heard a smacking or tapping sound, as if Stinson was hitting McVay; Hobbs heard the sound at least five times. *Tr. Vol. 2* at 208. McVay appeared fine, but a few seconds later, he slumped over and fell unconscious. *Id*. at 211. After realizing that Stinson, in fact, had been stabbing McVay, Hobbs said to Stinson, "Are you fucking kidding me? That's your best friend." *Id*. Hobbs was also injured during the attack when Stinson, while drawing his knife back, cut Hobbs's right temple. *Id*. at 208. The entire attack lasted between five and ten seconds. *Id*. at 209.

[4] Because Hobbs was a half mile from his house, he continued driving. Arriving a short time later, Hobbs parked "cockeyed" in his driveway, which he never did, to alert his girlfriend, Delilah Middaugh ("Middaugh"), that something was wrong. *Id*. at 212-13. Hobbs left the car running, the lights on, and the driver door open. As Applegate exited the car, Hobbs gave her the keys to his house and told her to call 911; Applegate ran toward the house. *Id*. at 214. Hobbs thought that McVay was already dead; Stinson stepped out of the car, looked at McVay, and kept walking. Hobbs told Stinson that "everything was over," by which he meant, "The night was over and so was, pretty much, [Stinson's] freedom." *Id*. at 215. Stinson responded, "What are you talking about? It's not over. . . . [McVay]'s dead. Let's go do some shots." *Id*.

[5]     It was at that time that Applegate came from the back of the house. She was still holding the keys because she could not get into the house. *Id*. at 216. Seeing Applegate, Hobbs immediately grabbed her by the collar and led her back toward the house. Hobbs began unlocking the door, but it was opened by Middaugh. Afraid that Stinson might hurt Applegate, because she was a witness to the stabbing, Hobbs pushed Applegate into the house for her own safety. *Id*. at 218-19. Hobbs told Middaugh that Stinson had stabbed McVay, and she should call 911. *Id*. at 216. Hobbs shut and locked the door, and when he turned around and saw Stinson standing about eight feet away, Hobbs pushed Stinson off the porch. *Id*. at 216-17.

[6]     Hobbs ran back to his car, "jumped in as fast as [he] could," repeatedly hit the button to lock his door, and drove away with McVay in the passenger seat. *Id*. at 217. With the dome light on, Hobbs could see blood and "realized how much more serious [the injury] was than [Hobbs] thought." *Id*. Hobbs started "screaming" McVay's name. *Id*. When he got no response, he drove to a nearby mortuary and pounded on the door. When no one answered the door, Hobbs called Middaugh to make sure she and Applegate were alright and again told Middaugh to call 911. *Id*. at 218. During this call, which Middaugh testified Hobbs made about a minute after he left the house, Hobbs told Middaugh, "The kid's dying . . . in your car." *Tr. Vol. 3* at 16. Hobbs ended the call and called 911.

[7]     While awaiting the arrival of emergency personnel, Hobbs noticed that McVay was making "gargling" or "snoring" sounds. *Tr. Vol. 2* at 218. Paramedics

arrived and found McVay "very pale," not verbally communicating, making non-purposeful movements, and bleeding profusely. *Tr. Vol. 3* at 60. The paramedics determined that McVay should be taken to Lutheran Hospital because it had a trauma center. During surgery, surgeons discovered that McVay's carotid artery was cut in half. *Id*. at 79. They also noticed that McVay had multiple stab wounds to the left of his neck, to the back of his neck, to his face, and to his right hand. *Id*. One of the knife thrusts chipped McVay's bone. Due to the loss of blood to his brain, McVay suffered one or more strokes, which left him unable to use his right hand and with a limited ability to speak. *Id.* at 78, 80-81, 118. Lutheran Hospital surgeon Dr. Dale Sloan ("Dr. Sloan") testified that the paramedic's decision to take McVay to a hospital with a trauma center saved his life. *Id*. at 80.

[8] On January 5, 2018, the State charged Stinson with Count I, aggravated battery with McVay as the victim, and Count II, battery with a deadly weapon with Hobbs as the victim. Thereafter, the State filed notice of its intent to seek a habitual offender enhancement in Count III. On June 6, 2018, the trial court granted leave for the State to add Count IV, a charge of attempted murder with McVay as the victim. The trial court held a three-day jury trial in October 2018, during which the State introduced the testimony of Hobbs, McVay, and Applegate, among others. Hobbs and McVay testified that Stinson was the one who stabbed McVay. *Tr. Vol. 2* at 208, 221, 114. Applegate testified that she knew McVay was injured in the car, but, because she was drunk, she could not recall what happened that night. *Tr. Vol. 2* at 250; *Tr. Vol. 3* at 4. Applegate

testified, "I remember I was crying, I was just like freaking out, there was a lot of yelling and noise and I was freaking out." *Tr. Vol. 2* at 249. It was defense counsel's theory that someone else stabbed McVay. *Tr. Vol. 3* at 4. The State cast doubt on this theory by introducing evidence that McVay did not hurt himself and that Hobbs was also injured. *Tr. Vol. 2* at 208, *Tr. Vol. 3* at 115. Regarding the claim that Applegate may have stabbed McVay, the State introduced the testimony of Dr. Sloan, who stated that, while it would not take a lot of power for a knife to penetrate the skin, it would take "more power to actually chip a bone." *Tr. Vol. 3* at 82. The State also noted that Hobbs tried to get help for McVay, while Applegate stayed with Middaugh. *Id*. at 28. Stinson, the only of the four who could not be accounted for after McVay's stabbing, was later found at a bar. *Id*. at 50.

[9] The jury found Stinson guilty of aggravated battery, battery with a deadly weapon, and attempted murder. Phase two of the trial, regarding the habitual offender enhancement, began on October 4, 2018. After hearing evidence and argument, the jury deliberated and determined that Stinson was a habitual offender. At the sentencing hearing, the State moved to dismiss the aggravated battery count on double jeopardy grounds, which the trial court granted. The trial court sentenced Stinson to forty years in the Indiana Department of Correction for attempted murder, enhanced by twenty years for being a habitual offender, to be served consecutively to six years for battery with a deadly weapon, for an aggregate sentence of 66 years. *Appellant's App. Vol. III* at 88, 90. Stinson now appeals.

# Discussion and Decision

## I. Excited Utterance Exception to Hearsay Rule

[10]    Stinson appeals the trial court's admission of Hobbs's out-of-court statements as recounted in court by Middaugh, contending that they were inadmissible hearsay that did not fall within the excited utterance exception. A trial court has broad discretion in ruling on the admissibility of evidence, and we disturb those rulings only upon an abuse of that discretion. *Chambless v. State*, 119 N.E.3d 182, 188 (Ind. Ct. App. 2019), *trans. denied*. "An abuse [of discretion] occurs only where the trial court's decision is clearly against the logic and effect of the facts and circumstances." *Id*. There is a strong presumption that the trial court properly exercised its discretion. *Id*. "In determining the admissibility of evidence, we will only consider evidence that favors the trial court's ruling and unrefuted evidence that favors a defendant." *Id*.

[11]    Hearsay is "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is not admissible except as provided by law or by other court rules. Ind. Evidence Rule 802. A trial court may admit hearsay that qualifies under the excited utterance exception. *See* Ind. Evidence Rule 803(2).

[12]    Stinson complains that Middaugh should not have been able to testify before the jury regarding Hobbs's out-of-court statements that "Cody [Stinson] stabbed Mark [McVay]," *Tr. Vol. 3* at 15, and that "[t]he kid's dying in your . . . car."

*Id.* at 16. Statements made by a witness are "admissible as substantive evidence pursuant to Indiana Evidence Rule 803(2) when the statements (a) pertain to a startling event or condition; (b) are made while the declarant was under the stress or excitement caused by the event or condition; and (c) are related to the event or condition." *Lawrence v. State*, 959 N.E.2d 385, 389 (Ind. Ct. App. 2012), *trans. denied.* "This test is not 'mechanical' and admissibility turns 'on whether the statement was inherently reliable because the witness was under the stress of the event and unlikely to make deliberate falsifications.'" *Teague v. State*, 978 N.E.2d 1183, 1187 (Ind. Ct. App. 2012) (quoting *Sandefur v. State*, 945 N.E.2d 785, 788 (Ind. Ct. App. 2011)). "The lapse of time is not dispositive, but if a statement is made long after a startling event, it is usually 'less likely to be an excited utterance.'" *Id.* (quoting *Boatner v. State*, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010)). "The heart of the inquiry is whether the declarant was incapable of thoughtful reflection." *Id.*

[13] Stinson contends that there was no foundation for a finding that Hobbs's statements to Middaugh constituted an excited utterance. We disagree. There is little doubt that these four friends, who were celebrating New Year's Eve together, did not expect that, at the end of the evening, Stinson would have stabbed his best friend. It was clearly a startling event for Hobbs to see Stinson, his half-brother, reach over the seat, apparently to hit McVay, and later discover that Stinson had stabbed McVay. Hobbs did not immediately know that McVay had been stabbed, but when Hobbs was only a half-mile from his house, he saw McVay slumped over and unconscious. *Tr. Vol. 2* at 208, 212.

Realizing what had occurred, Hobbs said to Stinson, "Are you fucking kidding me?  That's your best friend."  *Id*. at 211.

[14]  When Hobbs arrived home, he did not calmly get out of the car, instead, he jumped out, leaving the car running, with its lights on, and the car door open.  *Id.* at 213.  He explained he did this, "So I could get back in as fast as I could."  *Id*.  Hobbs ordered Applegate to go into the house and call 911.  Hobbs thought that McVay was already dead; Stinson stepped out of the car, looked at McVay, and kept walking.  Hobbs told Stinson that "everything was over," by which he meant, "The night was over and so was, pretty much, [Stinson's] freedom."  *Id*. at 215.  Stinson replied, "It's not over.  . . . [McVay's] dead.  Let's go do some shots."  *Id*.  When Applegate returned, because she could not get into the house, Hobbs did not just walk her back to the house; instead, he grabbed her by the collar, led her back to the house, and tried to open the door.  When the door finally opened, Hobbs pushed Applegate into the house,[4] telling Middaugh, "Cody [Stinson] stabbed Mark [McVay].  Call 911."  *Tr. Vol. 3* at 15.  This statement was made while Hobbs was under the stress or excitement caused by McVay being stabbed.  This was Hobbs's state of mind when he told Middaugh. "Cody [Stinson] stabbed Mark [McVay].  Call 911."  *Tr. Vol. 3* at 15.

---

[4] As additional evidence of Hobbs's stressed state of mind, he explained that he pushed Applegate through the door because he "figured [Stinson] might attack her 'cause she was a witness."  *Tr. Vol. 2* at 219.

Hobbs then ran back to his car, "jumped in as fast as [he] could," "hit the lock button probably 50 times and turned the car around I think somehow and started driving away" with McVay in the passenger seat. *Id.* at 217. By means of the dome light, Hobbs could see blood and "realized how much more serious [the injury] was than [Hobbs] thought." *Id.* Hobbs started "screaming" McVay's name. *Id.* When he got no response, he drove to a nearby mortuary and pounded on the door. When no one answered the door, Hobbs called Middaugh to make sure she and Applegate were alright and again told Middaugh to call 911. *Id.* at 218. During this call, which Middaugh testified Hobbs made about a minute after he left the house, Hobbs told Middaugh, "The kid's dying . . . in your car." *Tr. Vol. 3* at 16. Hobbs ended the call and called 911.

This evidence strongly supports a finding that these two statements were excited utterances. Hobbs's statements pertained to the startling event of the stabbing, were made while Hobbs was under stress caused by the stabbing, and were related to the stabbing. We find no abuse of discretion in the trial court's decision to allow these statements into evidence under the hearsay exception of excited utterance

## II. Leading Questions on Direct Examination

Stinson next contends that the trial court abused its discretion when it allowed the State to ask McVay leading questions during direct examination. The decision to admit or exclude evidence is within the trial court's sound discretion

and is afforded great deference on appeal. *Norris v. State*, 53 N.E.3d 512, 525 (Ind. Ct. App. 2016). An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*. However, as we explain below, our standard of review changes when a party fails to object at trial.

[18] At trial, Stinson did not object for any reason to the State's questioning of McVay and suggests, only now, that the trial court erred by permitting the State to ask leading questions of McVay during direct examination. *See Tr. Vol. 3* at 107-20. As a general rule, "[a] party's failure to object to, and thus preserve, an alleged trial error results in waiver of that claim on appeal."[5] *Batchelor v. State*, 119 N.E.3d 550, 556 (Ind. 2019). The rule of waiver is designed to promote fairness "by preventing a party from sitting idly by," ostensibly agreeing to a ruling "only to cry foul" when the court ultimately renders an adverse decision. *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). "While the waiver doctrine advances important policies of judicial efficiency, mere expediency is not an appropriate appellate goal." *Id*. (internal quotation marks omitted). "The

---

[5] Fundamental error is an extremely narrow exception to the general rule that a party's failure to object at trial results in a waiver of the issue on appeal. *Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018). To establish fundamental error, the defendant faces the heavy burden of showing that the alleged error was so prejudicial to his rights as to make a fair trial impossible. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). "The defendant must show that, under the circumstances, the error constituted clearly blatant violations of basic and elementary principles of due process and presented an undeniable and substantial potential for harm." *Id.* (internal quotation marks omitted). Stinson does not argue that allowing McVay to testify in response to leading questions was fundamental error. However, because we find that the trial court did not abuse its discretion when it allowed the State to use leading questions, a claim of fundamental error, even if made, would fail.

objectives of trial procedure are to secure determinations that are not only speedy and inexpensive but also just." *Id.* (internal quotation marks omitted).

[19] At the start of the first day of trial, before voir dire, the trial court addressed the parties' motion in limine and motion to compel Stinson to provide his fingerprints for the habitual offender phase of trial. The State also raised to the trial court and defense counsel the following specific concern:

> [PROSECUTOR]: We talked about this briefly on Friday as it relates to the questioning of Mark McVay. He is only able to say the words "yes" and "no," and the Court has been very gracious in allowing us to have a tablet, which will help him communicate, but we are asking for some latitude in questioning him. We don't plan to – I know, typically, people – everyone thinks the yes or no are leading questions; but unfortunately, because of this injury due to this case, all he – the only way that he can communicate is "yes" or "no" and with the tablet, which only has a few very common phrases. . . . Your Honor, []we'd just ask for accommodations because of his injury.
>
> THE COURT: Any problem with that, gentlemen?
>
> [DEFENSE COUNSEL]: No, your honor.

*Tr. Vol. 2* at 9-10. From this exchange, it is clear that, before trial, defense counsel was both aware that McVay's injuries resulted in verbal limitations and agreed that it was appropriate to allow McVay the accommodation to testify using only answers of yes and no. Here, the trial court did not abuse its discretion when it allowed the State to use leading questions.

[20] Furthermore, even if Stinson had objected, his objection would have been overruled. Indiana Evidence Rule 611(c) provides: "Leading questions should not be used on direct examination except as necessary to develop the witness's testimony." "A leading question is one that suggests the desired answer to the witness." *Jones v. State*, 982 N.E.2d 417, 430 (Ind. Ct. App. 2013), *trans. denied*. The use of leading questions is "limited in order to prevent the substitution of the attorney's language for the thoughts of the witness as to material facts in dispute." *Id*. "The trial court is afforded wide discretion in allowing leading questions, and the court's decision will be reversed only for an abuse of discretion." *Id*.

[21] Stinson argues that McVay's testimony was the result of leading questions, and the State's questions were specifically crafted to mirror the testimony of prior witnesses. *Appellant's Br*. at 13. Stinson finds it "most troubling" that the "State presented no evidence and laid no foundation, other than McVay's responses to other leading questions, that [McVay] was unable to answer questions in some other fashion." *Id*. We disagree with Stinson's assertion. Stinson knew that McVay was seriously disabled, had limited speech, and could only answer questions with a yes or no. Before voir dire, the State explained to opposing counsel and the trial court that "everyone thinks the yes or no are leading questions; but unfortunately, because of this injury due to this case, all he – the only way that [McVay] can communicate is 'yes' or 'no.'" *Tr. Vol. 2* at 10. A trial court has wide discretion and is afforded great deference on appeal. *Jones*, 982 N.E.2d at 430. Given the fact that McVay's injuries limited his ability to

communicate, the trial court did not abuse its discretion when it allowed the State to ask McVay leading questions during direct examination. *See Norris*, 53 N.E.3d at 525.

[22] Furthermore, McVay's identification of his attacker was not obtained through a leading question. The State questioned McVay as follows:

Q Okay. Were you attacked while you were in the car?

A Yeah.

Q Do you remember who did it to you?

A Yeah.

Q This may seem like a silly question, but did you hurt yourself while you were in the car? Did you hurt yourself?

A No.

Q Do you see the person who hurt you in the car in the courtroom today?

A Yeah.

Q Was it Shane [Hobbs] that hurt you?

A No.

Q Was it Spring [Applegate] that hurt you?

A  No.

Q  Was it Cody [Stinson] who hurt you?

A  Yeah.

*Tr. Vol. 3* at 114-15.  Here, the State knew that the injury occurred in the car and that only four individuals had been in the car that night.  McVay said he did not harm himself but knew who had attacked him.  The State's questioning gave McVay the opportunity to identify any of the other three as the attacker.  After denying that either Hobbs or Applegate was the attacker, McVay identified Stinson as the attacker.  We find no error.

[23]  Affirmed.

Vaidik, C.J., and Altice, J., concur.