

FILED

Apr 26 2016, 8:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stanley L. Campbell
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher C. Norris, | April 26, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 02A03-1507-CR-841 |
| v. | Appeal from the Allen Superior Court |
| State of Indiana, | The Honorable John F. Surbeck |
| *Appellee-Plaintiff.* | Trial Court Cause No. 02D06-1410-F5-92 |

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Christopher C. Norris (Norris), appeals his conviction for battery, a Level 5 felony, Ind. Code § 35-42-2-1.

[2] We affirm.

## ISSUES

[3] Norris raises four issues on appeal, which we restate as:

   (1) Whether the trial court erred in determining that J.B. was unavailable to testify as a protected person pursuant to I.C. § 35-37-4-6(e)(2)(B)(i);

   (2) Whether the trial court abused its discretion by admitting the videotaped forensic interview of J.B. at trial, together with the testimony of three other witnesses;

   (3) Whether the trial court abused its discretion by admitting vouching testimony; and

   (4) Whether the trial court erroneously allowed the drumbeat repetition of J.B.'s allegations by various witnesses.

## FACTS AND PROCEDURAL HISTORY

[4] In August of 2014, Nicole Pappas (Pappas) and her son, four-year-old J.B., started living with Norris in Norris' residence. Norris had two biological sons from different relationships, thirteen-year-old C.N. and five-year-old B.H., with whom he had regular visitation. At some point during that month, B.H. saw Norris spanking J.B. "a lot." (Transcript p. 168). B.H. asked his father "to stop

spanking J.B. [but] he didn't." (Tr. p. 170). C.N. also saw Norris "spank J.B. really hard" and noticed that J.B.'s buttocks were "black and purple." (Tr. pp. 237, 235).

[5] On August 23, 2014, Norris and Pappas took the three boys to a neighborhood park with a water playground for children. While at the park, someone took a photo of J.B. and posted it to Twitter. Eric Bennett (Bennett), J.B.'s father, saw the photo and believed that J.B.'s face looked swollen and that he might have a black eye. Bennett called the police. On August 25, 2014, Bennet went to Norris' residence where police officers were already present. After Bennett demanded to see his son, J.B. was brought outside. Bennett, J.B., and an officer stepped aside, and Bennett spoke with J.B. When Bennett attempted to pick up J.B., J.B. cried out "ow." (Tr. p. 96). J.B. showed his father the bruises on his lower back and buttocks; Bennett also noticed fingerprints on the inside of J.B.'s arm as if somebody had grabbed him.

[6] The Department of Child Services (DCS) was summoned and family case manager Kim Gorman (FCM Gorman) arrived. FCM Gorman took photographs of J.B.'s injuries. J.B. told her that Norris had spanked him because he had kicked the dog in the face. When FCM Gorman spoke with Norris, Norris admitted to spanking J.B. because of the incident with the dog. J.B. was removed from the residence that day.

[7] The following day, on August 26, 2014, J.B. was examined by Dr. Thomas Kintanar (Dr. Kintanar), a family physician. Dr. Kintanar observed clear

"handprints on [J.B.'s] buttocks" from an "extremely traumatic event" and bruising around the belt line and torso. (Tr. p. 145, 150). Dr. Kintanar also documented bruises on the arms, caused by J.B. being "grabbed quite forcefully by the arm and drug up." (Tr. p. 146). Dr. Kintanar found fingerprint marks and bruises from hands on J.B.'s back and noticed that J.B. had a black eye.

[8]     On October 24, 2014, the State filed an Information charging Norris with battery, a Level 5 felony. On January 8, 2015, the State filed its notice of intent to use statements of protected person, which the State amended on February 27, 2015. On April 10, 2015, the trial court conducted a hearing on the State's motion and on April 21, 2015, the trial court found, in pertinent part, that J.B., the protected person,

> is unavailable as a witness based upon the testimony of a
> psychologist as well as an additional witness (Pat Smallwood)
> specially trained to communicate with children such as the
> protected person in this case ([J.B.]).
>
> The [c]ourt finds, based upon said testimony, that requiring the
> protected person to testify in the physical presence of [Norris]
> will cause the protected person to suffer serious emotional
> distress such that the protected person cannot reasonably
> communicate.

(Appellant's App. p. 16). Finding sufficient indications of reliability, the trial court admitted J.B.'s videotaped forensic interview and permitted the State to call up to three additional witnesses to testify as to statements made to them by J.B., the protected person. On May 12 through May 14, 2015, the trial court

conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict. On June 8, 2015, Norris was sentenced to five years executed, with two years suspended to probation.

[9] Norris now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Protected Person*

[10] Norris contends that the trial court erred in its determination that J.B. was unavailable to testify pursuant to the provisions of the protected person statute, enacted at I.C. § 35-37-4-6. The decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal. *Taylor v. State*, 841 N.E.2d 631, 634 (Ind. Ct. App. 2006), *trans. denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*. However, "[a]t the same time, the protected person statute impinges upon the ordinary evidentiary regime such that we believe a trial court's responsibilities thereunder carry with them what we recently called in another context 'a special level of judicial responsibility.'" *Carpenter v. State*, 786 N.E.2d 696, 703 (Ind. 2003).

[11] Indiana Code section 35-37-4-6 provides, in relevant part, that an otherwise inadmissible statement or videotape made by a protected person (here, a child under fourteen years of age) is admissible in criminal actions involving battery, as defined in I.C. § 34-42-2-1, if the following conditions are met:

(1) The court finds, in a hearing:

    (A) conducted outside the presence of the jury; and

    (B) attended by the protected person in person or by using a closed circuit television testimony [];

that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.

(2) The protected person:

    (A) testifies at the trial; or

    (B) is found by the court to be unavailable as a witness for (1) of the following reasons:

        (i) From the testimony of a psychiatrist, physician, or psychologist, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate.

[12] Norris does not make the traditional claim under the protected person statute that he did not have the opportunity to cross-examine J.B. *See, e.g., Howard v. State*, 853 N.E.2d 461, 470 (Ind. 2006) (stating that "prior testimony from a subsequently unavailable witness is admissible at a subsequent trial, provided the defendant had the opportunity to confront the witness when the testimony was originally given"). Rather, focusing on the unavailability prong of the

statute,[1] Norris first contends that the unavailability determination can only be drawn from the testimony of a "psychiatrist, physician, or psychologist" and "other evidence, if any[.]" *See* I.C. § 35-37-4-6(e)(2)(B)(i). Norris maintains that this "other evidence" within the meaning of the statute cannot be additional witness testimony, like here, but rather must consist of "a consideration of testimony from designated individuals who are either a psychiatrist, physician, or psychologist and then any other evidence that might be presented (like maybe medical reports or other documents)." (Appellant's Br. p. 12).

[13] "The statute provides that a psychiatrist, physician, or psychologist must present evidence regarding the potential for serious emotional harm to the protected person that testifying would cause." *Cox v. State*, 937 N.E.2d 874, 878-79 (Ind. Ct. App. 2010), *trans. denied*. Therefore, a "trial court's observations of the child standing alone, are insufficient to meet the statutory standard of unavailability established by the [statute]." *Id*. at 879. During the protected person hearing, the State presented as its witness Dr. David Lombard (Dr. Lombard), a clinical psychologist to whom J.B. was referred in November

---

[1] The State appears to characterize Norris' argument as a "challenge to the court's finding of reliability." (Appellee's Br. p. 13). Pursuant to the language of the statute, the reliability determination falls within the first prong of the statute, *i.e.,* whether the out-of-court statements are sufficiently reliable to be admitted at trial. However, the testimony of a "psychiatrist, physician, or psychologist," and "other evidence, if any" only comes into play if the witness is unavailable to testify at trial. *See* I.C. § 35-37-4-6(e)(2)(B).

2014 to assess the child's cognitive abilities and his mental health condition.

Dr. Lombard opined that

> [a]t the time [J.B.] was displaying symptoms consistent with three conditions.  Generalize[d] anxiety disorder, which is just anxiety throughout the day.  . . . Another condition we call reactive attachment disorder.  He has some significant [sic] the primary adult figures in his life around that time and lack of emotion connection in feeling safety in their care [sic].  And then the third condition was impaired parent/child relationship.  He felt very distant from his mother, felt his mother had allowed [Norris] to harm him and didn't intervene.

(PPH[2] Transcript p. 77).  Based on this diagnosis, Dr. Lombard concluded as follows with respect to J.B.'s ability to testify at trial:

> My concern was with a couple of issues.  One was the environment in a normal courtroom, people watching him, staring at him as people are now, may overwhelm him, triggers anxiety.  He was very worried about [Norris] being very angry at him.  He was very worried about disappointing his mother and saying anything that may hurt her feelings.  So my concern at the time was, you combine that with his generalized anxiety disorder and he already feels estranged from the adults and my concern was that could worsen those conditions.

---

[2] We will use the abbreviation 'PPH' to refer to the transcript of the protected person hearing.

(PPH Tr. pp. 77-78). Thereupon Dr. Lombard unequivocally affirmed the State's question whether he believed "to a medical degree of certainty" that this diagnosis would "render [J.B.] unable to communicate." (PPH Tr. p. 78).

[14] However, besides relying on Dr. Lombard's testimony to reach its finding of unavailability, the trial court also referred to "other evidence." *See* I.C. 35-37-4-6(e)(2)(B)(i). Specifically, the trial court referenced the testimony of "an additional witness (Pat Smallwood) specially trained to communicate with children such as the protected person in this case ([J.B.])." (Appellant's App. p. 16). Norris contends that the trial court erred as this "other evidence" must take the form of "like maybe medical reports or other documents." (Appellant's Br. p. 12). We disagree.

[15] The language of the statute itself prescribes that a trial court's finding of unavailability can be based solely on the testimony of a psychiatrist, physician, or psychologist. The statute then continues that following this testimony, the finding can be supported by "other evidence, if any[.]" *See* I.C. § 35-37-4-6. Thus, while the 'other evidence' is not mandated, it could be used to provide further substantiation to declare the protected person unavailable. Here, the trial court referenced Pat Smallwood's (Smallwood) testimony in support of its conclusion. As the statute does not further define 'other evidence' and testimony is considered evidence, we conclude that the trial court properly considered Smallwood's testimony as an additional source of support to reach its conclusion of J.B.'s unavailability.

[16] Next, Norris in essence disputes the sufficiency of the trial court's finding that testifying at trial would cause J.B. "serious emotional distress such that the protected person cannot reasonably communicate." *See* I.C. § 35-37-4-6. To support the insufficiency of the evidence, Norris points to Dr. Lombard's testimony which is couched in terms of 'may' and 'might' that is contradictory to the mandatory statutory findings which require a determination that serious emotional distress 'will' be caused to the level that the protected person cannot reasonably communicate.

[17] The statute requires that the trial court, and not the medical professional, makes the determination whether trial testimony would cause the protected person serious emotional distress such that the protected person cannot reasonably communicate. Here, Dr. Lombard's testimony presented a medical opinion, which articulated J.B.'s diagnosis and included Dr. Lombard's multiple concerns that trial testimony in Norris' presence "would worsen" J.B.'s conditions. (Tr. p. 78). As such, Dr. Lombard stated that, to a medical degree of certainty, this "may render J.B. unable to communicate." (Tr. p. 78). Mindful of the statute's goal—to reduce a child's emotional trauma caused by numerous court appearances—the trial court properly relied on Dr. Lombard's statements to declare J.B. unavailable. *See Miller v. State*, 517 N.E.2d 64, 73 (Ind. 1987). Accordingly, we conclude that the trial court properly determined J.B. to be a protected person who was unavailable as a witness.

II. *Videotaped Statement and Other Hearsay Testimony*

Norris contends that the trial court abused its discretion in admitting the videotaped statement of J.B. at trial, as well as the hearsay testimony by three other witnesses.

## A. Videotaped Statement

With respect to the videotaped statement, Norris now focuses on the reliability prong of the protected person statute. Pursuant to I.C. § 35-37-4-6(e)(1), the court may admit the videotaped out-of-court statements made by a protected person, if the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability. "Considerations in making the reliability determination under [I.C. § 35-37-4-6] include the time and circumstances of the statement, whether there was significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, use of age appropriate terminology, and spontaneity and repetition." *M.T. v. State*, 787 N.E.2d 509, 512 (Ind. Ct. App. 2000). Doubt may be cast on the reliability of the statement or videotape if it is preceded by lengthy or stressful interviews or examinations. *Id*.

Following the protected person hearing, the trial court found J.B.'s videotaped statements made to Smallwood at the Child Advocacy Center on September 23, 2014, to be admissible at trial. In its Order granting the admission of the videotaped statement, the trial court noted, in pertinent part, as follows:

> 4. The alleged victim in this case was the subject of a video-taped statement concerning an act which is a material element of the offense charged in this cause.

5.  A hearing was held outside the presence of the jury at a time substantially removed from the date scheduled for jury trial.

6.  The hearing was attended by the protected person through the use of closed circuit television in which the [c]ourt and [Norris] were present in one (1) room while the protected person and respective counsel for the State and Defense were in another room.

7.  At said hearing the protected person testified on direct examination of the State of Indiana and was further cross-examined by Defense counsel.

8.  The time, content, and circumstances of the statement or videotape provides sufficient indications of reliability.

(Appellant's App. pp. 15-16).

[21]  Smallwood, a forensic interviewer, testified during the protected person hearing. Although J.B. had been removed from his home on August 25, 2014, he was not interviewed by Smallwood until twenty-nine days later, on September 23, 2014. During the hearing, Smallwood described J.B. as a "young four [year old]. In other words, he's not particularly sophisticated." (PPH Tr. p. 86). She noted that, even though J.B. was young, he was not susceptible to coaching because "this child, in addition to saying that something happened also demonstrated physically on himself and gave other details about how the incident happened that were in consistent language for a four year old, they were developmentally appropriate and not the kind of things that somebody else would say to him." (PPH Tr. p. 87). She added that J.B.

corrected her on at least two occasions when she stated inaccuracies during the interview. Smallwood explained that those corrections increased her "belief in their reliability" because the child does not allow you "to put words in their mouth." (PPH Tr. p. 88). J.B. was able to distinguish between innocent scenarios or injuries versus the injuries inflicted by Norris. He demonstrated "in the interview the difference between, he slaps on the chair on how his mother spanks and then how [Norris] spanks him." (PPH Tr. p. 89).

[22] Although there were twenty-nine days between the day J.B. was removed from the home and the forensic interview, J.B.'s statements are cloaked with sufficient indicia of reliability. During the interview, J.B. was spontaneous in his responses and demonstrative of how he incurred the bruises. At times, he even corrected Smallwood's inaccuracies. Accordingly, the trial court did not abuse its discretion in admitting J.B.'s videotaped statements.

### B. Other Hearsay Statements

[23] In its Order following the protected person hearing, the trial court not only found J.B.'s videotaped statement admissible at trial, but also permitted the State "to call up to three (3) additional witnesses, in addition to the videotape, . . . who may testify as to statements made to them by [J.B.] regarding the allegations contained in this cause against [Norris]." (Appellant's App. p. 16). At the trial, the State called FCM Gorman, Angela Arambula (Arambula), and Laura Swanson (Swanson) as its three additional witnesses.

### 1. FCM Gorman

[24]     Unlike for the other two witnesses, Norris does not make any specific arguments or objections as to the trial court's abuse in admitting J.B.'s statements through FCM Gorman's testimony. In fact, Norris seemingly concedes that J.B.'s statement to FCM Gorman was properly admitted as it was "[t]he only statement that is close in time to the discovery of the injuries to J.B." (Appellant's Br. p. 23). Therefore, as Norris fails to articulate a cogent argument, he waived the issue for our review. *See* Ind. Appellate Rule 46(A)(8)(a).

## 2. Arambula

[25]     Arambula is J.B.'s foster parent. While she did not testify at the protected person hearing, she did testify at trial. Norris now "contends that it was error to allow the testimony of Arambula as to statements made by J.B. since Arambula did not testify at the [p]rotected [p]erson [h]earing." (Appellant's Br. p. 18).

[26]     At trial, after voir dire and prior to the presentation of witnesses, Norris requested the record to reflect a continuing objection to the admission of protected person evidence because Norris was afraid to offend the jury by his timely objections. The State asked clarification of the extent of the continuing objection and the trial court declared that Norris' "protective person objection will be incorporated in the record today as if made contemporaneously[.]" (Tr. p. 41). Norris' protective person objection focused on the reliability of J.B.'s out of court statements made to certain witnesses. Accordingly, as Norris now

formulates an objection different from the one covered by the continuing objection, this argument is waived for our review. *See, e.g., Gill v. State*, 730 N.E.2d 709, 711 (Ind. 2000).

[27]    In addition, Norris also contends that "the statement by J.B. to Arambula suffers from the same defect as the video-taped statements introduced through Smallwood and the statements introduced through the testimony of [FCM] Gorman and Swanson," *i.e*, they do not meet the criteria of reliability. (Appellant's Br. p. 19). However, besides making this generalized statement, Norris fails to inform us which statements he disputes or their location in the transcript. Because Norris fails to make a cogent argument supported by citations to the record, he has waived his claims for our review. *See* App. R. 46(A)(8)(a).

### 3. Swanson

[28]    Swanson is a therapist who provided counseling to J.B. in December 2014 to address "a trauma history and anxiety behavior problems that he was exhibiting at home." (PPH Tr. p. 46). Although Swanson testified at the protected person hearing, the State did not list her as a witness on its second amended notice of intent to use statements of protected person. Nevertheless, Swanson testified at trial. Norris now contends that the trial court abused its discretion to allow Swanson's testimony about J.B.'s statements because she was not listed on the State's second amended notice of intent. As with Arambula, Norris' continuing objection at trial failed to include the basis Norris now objects to the testimony

on appeal. As the objection at trial was distinct from the argument before us, Norris waived the issue for our review. *See, e.g., Gill*, 730 N.E.2d at 711.

[29] Next, Norris also disputes the admissibility of J.B.'s statements to Swanson based on reliability grounds. In protected person situations, the victim is often an incompetent witness and trial courts "must use special care when making findings of sufficient indications of reliability under the statute because these findings act as the sole basis for finding the trustworthiness that permits introduction of otherwise inadmissible hearsay." *Pierce v. State*, 677 N.E.2d 39, 44 (Ind. 1997).

[30] At trial, Swanson testified that during a counseling session in December 2014, J.B. reported to her that "he had been hit, that his hair had been pulled, he had been yelled at, and had been punished with hot sauce in his mouth." (Tr. p. 273). While we agree that a significant amount of time had lapsed between the incident that removed J.B. from the house in August 2014 and his counseling session in December 2014, remoteness of time is merely one of the considerations to evaluate the statements' reliability under the protected person statute. *See M.T.*, 787 N.E.2d at 512.

[31] Swanson clarified that during her counseling sessions she only uses open ended questions. J.B. "actually spoke without any prompting, wanting to talk [] about the abuse that he endured." (Tr. p. 273). Swanson noted that J.B. never wavered in this response and his statements have remained consistent. Furthermore, J.B.'s statements to Swanson corresponded to the statements

given by him to FCM Gorman on the day he was removed from the residence. As we noted earlier, Norris does not contest the reliability of J.B.'s statements to FCM Gorman. While the remoteness in time between the day of the removal and the counseling sessions could provide an opportunity for coaching, the similarity and consistency of J.B.'s statements provide a sufficient indication of reliability. Accordingly, J.B.'s statements to Swanson were reliable and properly admitted at trial.

### III. *Vouching Testimony*

[32] Norris next contends that the trial court abused its discretion in admitting testimony by Smallwood which improperly vouched for the reliability of J.B.'s statements.

[33] Following the adoption of the Indiana Rules of Evidence, our supreme court held that certain expert testimony that was "an indirect but nonetheless functional equivalent of saying the child is 'telling the truth'" violated Ind. Evid. Rule 704(b). *Hoglund v. State*, 962 N.E.2d 1230, 1236 (Ind. 2012). After *Hoglund*, subsequent decisions from this court held that expert testimony about whether a child victim was coached violated Rule 704(b); however, general testimony about the signs and indicators of coaching and the presence and absence of those signs in the child victim nevertheless preserved the ultimate credibility issue for the jury. *See Kindred v. State*, 973 N.E.2d 1245, 1258 (Ind. Ct. App. 2012), *trans. denied*; *Archer v. State*, 996 N.E.2d 341, 349 (Ind. Ct. App. 2013), *trans. denied*.

[34] Recently, our supreme court expressly overruled *Kindred* and *Archer*, holding that the "subtle distinction" between whether a child has or has not been coached and whether a child did or did not exhibit signs of coaching was "insufficient to guard against the dangers that such testimony will constitute impermissible vouching as we expressed in *Hoglund*." *Samson v. State*, 38 N.E.3d 985, 991-92 (Ind. 2015).

> More precisely, when a jury is presented with expert testimony concerning certain coaching behaviors, the invited inference that the child has or has not been coached because the child fits the behavioral profile is likely to be just as potentially misleading as expert testimony applying the coaching behaviors to the facts of the case and declaring outright that a given child has or has not been coached. The danger of the jury misapplying this evidence thus remains the same whether an expert expresses an explicit opinion that coaching has or has not occurred or merely allows the jury to draw the final conclusion.

*Id*. at 991. Nonetheless, the *Sampson* court also held that "testimony about the signs of coaching and whether a child exhibited such signs or has or has not been coached" is permitted "provided the defendant has opened the door to such testimony." *Id*. at 992.

At trial, Smallwood testified as follows:

> [State]: Has anyone told [J.B.] while he was playing or to your knowledge, anybody told him what to say prior to coming into the room?
>
> [Smallwood]: Not that I'm aware of.

[State]:  Earlier we talked about indicia of reliability,[3] and you mentioned some things about demonstrating and language, did you find that there were indicia of reliabilities in –

[Norris]:  Your Honor. Your honor before we go any further with her response, can we approach again.

[Trial Court]:  Sure.

[Sidebar conference was conducted.]

[Norris]:  I feel like we're treading closer, vouching.

* * * *

[Norris]: She'd said before – you said before what are things are indicia of reliability.

[Trial Court]:  In whether she saw them, but not whether she believes the child's testimony.

* * * *

[Sidebar conference was concluded.]

[State]:  Did you find indicia of reliability in [J.B.'s] answers?

---

[3] Although the State never asked Smallwood outright whether J.B. had been coached prior to the forensic interview, Smallwood clarified that the "indicia of reliability" are designed to ensure "or try to be sure as best we can that the child is telling us their experience and not what someone has told them."  (Tr. p. 215).

[Smallwood]: Yes.

[State]: And what were those?

[Smallwood]: Well, he's very demonstrative. He shows on his own body the things that happened. He talks about the feeling that went with it, that it hurt. He gives information about the actual spanking or how he gets spanked. For example, he says, turn around and pull your pants down, and gets spanked with his pants down. So those are the kinds of things that, that's somebody elses [sic] word. Turn around and pull your pants down to me is an indication that something actually happened as far as the spanking. He's very concrete throughout about the words that he uses. I make some mistakes and he corrects me when I make the mistakes. For example when I thought he was talking about his eye getting hit, it's not his eye that gets hit. It's by his eye, but it's not his eye. So when I say your eye, he said no, it's not my eye. He corrects me more than once. When I try to say something about his mother's house, and he said my mother doesn't have a house, she lives at [Norris'] house. So he's kind of concrete and not afraid to speak up and say.

(Tr. pp. 221-23).

[35]  In this case, the State first questioned Smallwood, in general terms, about indicia of reliability when interviewing young children. Later during Smallwood's testimony, the State linked her general testimony to the specific question about identifying these general indicia in J.B.'s answers during the forensic interview. Although the State was careful to limit Smallwood's comments to her observations of these indicia without outright asking her whether she believed J.B. had been influenced prior to the interview, this was

neither in response to defense questioning, nor to rebut an express claim that J.B. had been coached. Accordingly, by questioning whether J.B. fit "the behavioral profile," Smallwood's testimony entered the realm of "the invited inference" specifically prohibited by our supreme court in *Sampson*. *See id*. at 991. Accordingly, the trial court abused its discretion when it admitted Smallwood's impermissible vouching testimony.

[36] Nevertheless, we conclude that the trial court's erroneous admission of the vouching testimony amounted to harmless error. "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Hubbell v. State*, 754 N.E.2d 884, 890 (Ind. 2001) (quoting *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995)). The record bears substantial evidence of Norris beating J.B. Both Norris' biological sons testified that they saw Norris beat J.B. and C.N. spoke about the bruises left on J.B.'s body. FCM Gorman testified about J.B.'s statement to her that Norris had spanked him. Dr. Kintanar testified as to his observations of clear "handprints on [J.B.'s] buttocks" from an "extremely traumatic event" and bruising around the belt line and torso. (Tr. p. 150). Therefore, we cannot conclude that the single instance of improperly admitted testimony affected Norris' substantial rights and thus was harmless. *See Hoglund*, 962 N.E.2d at 1238 (improper admission of evidence is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction).

IV. *Drumbeat Repetition of Testimony*

[37] Lastly, Norris contends that the trial court's admission of J.B.'s videotaped statement during the forensic interview, as well as allowing three additional witnesses to repeat J.B.'s out-of-court allegations amounted to a drumbeat repetition that denied him a fair trial. Specifically, he asserts that the combined testimonies of FCM Gorman, Arambula, and Swanson in addition to J.B.'s videotaped statements amounted to impermissible bolstering of J.B.'s credibility and unduly prejudiced the jury.

[38] As we noted before, the decision to admit or exclude evidence is within the trial court's sound discretion and is afforded great deference on appeal. *Carpenter*, 786 N.E.2d at 702. An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id*. at 703. The number of witnesses who may be called to prove a single issue of fact is within the trial court's sound discretion. *Dobbs v. State*, 143 N.E.2d 99, 100 (Ind. 1957), *reh'g denied*.

[39] Norris acknowledges that "there was no objection on the basis that this was drumbeat repetition[.]" (Appellant's Br. p. 28). "As a general rule, failure to object at trial results in waiver of an issue for purposes of appeal." *Washington v. State*, 840 N.E.2d 873, 886 (Ind. Ct. App. 2006), *trans. denied*. Thus, Norris' argument is waived. However, the error can be preserved if the trial court committed fundamental error in admitting the testimony and videotape into

evidence. The fundamental error doctrine is very narrow, and it arises only when there are "clearly blatant violations of basic and elementary principles, and the harm or potential for harm could not be denied." *Warriner v. State*, 435 N.E.2d 562, 563 (Ind. 1982). Fundamental error occurs only when the error is so prejudicial that a fair trial is rendered impossible. *Benefield v. State*, 945 N.E.2d 791, 801 (Ind. Ct. App. 2011).

[40] To support his argument of drumbeat repetition, Norris relies on *Modesitt v. State*, 578 N.E.2d 649, 650 (Ind. 1991), in which a child's mother, a welfare caseworker, and a psychologist all testified at length and in detail as to what the child told them regarding what Modesitt had done to her. Their testimony occurred prior to the victim testifying and was admitted over objection. *Id*. Our supreme court determined that permitting the three witnesses to repeat the accusations of the victim prior to the victim testifying unduly prejudiced the jury. *Id*. at 654.

[41] However, since *Modesitt*, both this court and our supreme court have held that, in some fact situations, the erroneous admission of evidence in violation of *Modesitt* is harmless. *See Craig v. State*, 630 N.E.2d 207, 211-12 (Ind. 1994) (holding that the improper admission of hearsay testimony of two witnesses that "confirmed but did not elaborate upon" the victim's testimony would have had only minor impact on the jury because there was little to undermine the victim's credibility); *McGrew v. State*, 673 N.E.2d 787, 796 (Ind. Ct. App. 1996) (holding that the improper admission of hearsay testimony from two witnesses whose testimony was "brief and consistent with" the victim's testimony did not

"constitute drumbeat repetition of the victim's statements") *reh'g denied, summarily aff'd* 682 N.E.2d 1289, 1292 (Ind. 1997); *Caley v. State*, 650 N.E.2d 54, 57 (Ind. Ct. App. 1995) (holding that admission of a prior consistent statement given to the police by the victim was erroneous under *Modesitt* but did not constitute reversible error because the statement "neither explained nor elaborated upon the testimony already adduced at trial"), *reh'g denied, trans. denied*.

[42]   Here, FCM Gorman and Arambula testified prior to J.B.'s videotaped statement being shown to the jury. FCM Gorman clarified to the jury how the case ensued, the injuries she observed on J.B., and how it is "part of [her] investigation to talk with the child . . . about what happened." (Tr. p. 116). Arambula briefly testified about J.B.'s drawing, depicting his injuries. She was not cross-examined on these statements, only on the date she received J.B. into her care. Neither witness embellished J.B.'s allegations with "her personal eloquence, maturity, emotion, and professionalism." *Stone v. State,* 536 N.E.2d 534, 540 (Ind. Ct. App. 1989), *trans. denied*. Accordingly, the challenged testimony of the two witnesses merely provided an overview of the situation and a summary of J.B.'s accusations, without elaborating on J.B.'s evidence. As in *McGrew*, their testimony on J.B.'s allegations was brief and consistent with J.B.'s later testimony. *See McGrew*, 673 N.E.2d at 796. Accordingly, we find that the admission of the witnesses' testimony did not deprive Norris of a fair trial and therefore did not constitute fundamental error.

## CONCLUSION

[43] Based on the foregoing, we conclude that J.B. was unavailable to testify as a protected person pursuant to I.C. § 35-37-4-6(e)(2)(B)(i); the trial court properly admitted the videotaped interview of J.B. at trial, together with the testimony of three other witnesses; the trial court committed harmless error by admitting vouching testimony; and there was no drumbeat repetition of J.B.'s allegations by different witnesses.

[44] Affirmed.

[45] Najam, J. and May, J. concur