## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 27 2017, 11:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Joas & Stotts
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Paul W. Barnes, Sr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | April 27, 2017 <br><br> Court of Appeals Case No. <br> 39A01-1610-CR-2313 <br><br> Appeal from the Jefferson Circuit Court <br><br> The Honorable Darrell M. Auxier, Judge <br><br> Trial Court Cause No. <br> 39C01-1506-F1-591 |

**Crone, Judge.**

# Case Summary

Paul W. Barnes, Sr., appeals his convictions for two counts of level 1 felony child molesting. He argues that the trial court abused its discretion in finding that he opened the door to the admission of testimony vouching for the victim. We conclude that Barnes did not open the door to the vouching testimony, but that the error in admitting the testimony was harmless. Therefore, we affirm.

# Facts and Procedural History

Barnes is B.B.'s paternal grandfather. In February 2015, ten-year-old B.B. lived with her younger brother and her mother. B.B.'s older brother lived with Barnes. On Friday, February 20, B.B. and her younger brother went to spend the weekend with Barnes. B.B.'s older brother left to spend the weekend with his aunt.

On Saturday, February 21, B.B. and her younger brother were playing video games in the game room. Barnes called B.B. to his bedroom and closed the door. He removed B.B.'s clothing and then took off his pants and underwear. Barnes pushed up against B.B. and rubbed his penis inside and outside her vagina. Barnes then placed her legs on his shoulders and told B.B. to "[f**ck] me." Tr. Vol. 2 at 68. Barnes also said, "[D]o you like this? … I bet you do." *Id.* B.B. "didn't like it" and it "hurt." *Id.* at 70, 73. B.B. told Barnes that she wanted her mom. At one point, B.B.'s younger brother knocked on Barnes's bedroom door to see if B.B. could come back out and play video games. Barnes told him that B.B. would come out in a little bit. After Barnes was finished, he

used a towel or a shirt to wipe a "sticky" substance from B.B.'s thighs. *Id.* at 72. He also wiped off his "private area." *Id.* B.B. got dressed and left the room. She did not tell her younger brother what happened because "he was too young." *Id.* at 73.

[4] The next day, Barnes told B.B. to shower. After her shower and before she got dressed, he told her to lie down on his bed. He pulled down his pants and underwear and told her that he wanted to "do it one more time." *Id.* at 78. He repeated his actions of the day before, rubbing his penis outside and inside of her vagina, which hurt her. *Id.* at 77. When he was finished, he wiped the same kind of sticky substance off B.B.'s thighs that he had the day before. He also had sticky stuff on "his private area" that he wiped off. *Id.* at 79. Afterward, he sprinkled baby powder between her legs.

[5] That evening, Barnes took B.B. and her younger brother home. B.B. went upstairs while Barnes talked to her mother. She waited to tell her mother what happened because she "was scared that [Barnes] would do something." *Id.* at 80. After he left, she wrote down on a piece of paper what happened and gave it to her mother. She wrote it down because she did not "like saying that kind of stuff." *Id.* at 81. B.B.'s mother started crying. She wanted to make sure that B.B. was not bleeding, so she told B.B. to pull down her underwear and immediately saw baby powder caked around B.B.'s vagina.

[6] B.B.'s mother called the police. A police officer came to their residence and made a report. B.B.'s mother took her to the hospital emergency room. B.B.

was also taken to a children's hospital for a sexual assault examination, and no physical injuries were discovered. A sexual assault evidence collection kit was also performed on B.B. The following day, Stephanie Back, a forensic interviewer with the Child Advocacy Center, interviewed B.B.

[7] In June 2015, the State charged Barnes with two counts of level 1 felony child molesting. A jury trial was held in August 2016. The State began its case-in-chief with B.B.'s mother's testimony. B.B. then testified regarding what Barnes did to her on February 21 and 22, 2015. Barnes's defense counsel did not cross-examine her. The jury also heard testimony from B.B.'s brothers, the police officer who responded to the initial report of child molestation, two detectives, and the child abuse pediatrician who was on call at the children's hospital when B.B. was admitted.

[8] Following an extended discussion outside the jury's presence, the State requested that Back be permitted to testify regarding the signs of coaching in children and whether she had observed signs of coaching when she interviewed B.B. Barnes objected, but the trial court concluded that Barnes had opened the door to such testimony and permitted Back to testify. *Id*. at 213. The emergency room doctor who examined B.B. testified, followed by Back. Back testified that she was trained to look for signs of coaching in children and that those signs included whether the child makes eye contact, makes emotional statements, or corrects the interviewer when the interviewer is speaking. She explained that she also considers whether the child has provided consistent statements to investigators or has a motive to fabricate. Tr. Vol. 3 at 22. She

then testified that she saw no signs of coaching when she interviewed B.B. *Id.* at 23.

[9] After Back testified, the State introduced evidence from the sexual assault kit. Two of the external genital swabs tested positive for the presence of sperm cells. *Id.* at 43. The DNA from the sperm cells was consistent with Barnes's DNA, and that DNA profile was estimated to occur once in eight trillion unrelated individuals. *Id.* at 44, 64-65. The DNA sample from the external genital swabs was of such high quality that it was unlikely that the sperm cells had been deposited on something else and then transferred to B.B. *Id.* at 45-46, 64. A major DNA profile and a minor DNA profile were also recovered from non-sperm cells. The DNA from the minor profile was consistent with Barnes's and was estimated to occur once in 3400 unrelated individuals. *Id.* at 47.

[10] Barnes testified that he did not have sexual intercourse with B.B. or place his penis on the outside of her vagina and never touched her in an inappropriate manner. *Id.* at 68-69. He also testified that he was never in the bedroom behind closed doors with her. *Id.* at 113. In addition, he explained how his semen could have been found on B.B. He testified that he uses kerosene to heat his residence, but B.B.'s mother does not like the smell. So, he keeps clothing for each of the children in a dresser in the children's bedroom. When the children come to his house, they change into the clothes Barnes keeps for them. Barnes then washes the clothes they were wearing when they arrived, so that they can wear clean clothes when they return home. He testified that on the evenings of February 20 and 21, B.B. and her younger brother either played

Xbox or watched television the entire time. On February 22, Barnes watched a NASCAR race on television. He told each child to take a shower. His bedroom was close to the bathroom, so he laid their clean clothes on his bed. Then, he masturbated in his bedroom beside the children's clothes. *Id.* at 84. When he was done, he "reached down and grabbed something to wipe off on, and it ended up being [B.B.'s] underwear." *Id.* at 85. Barnes testified that he "was going to take them and throw them in the washing machine, but I was so pre-occupied with the race [that he] hurried back up the hall to go watch the race, and I forgot about them." *Id.* at 85.

[11] The jury found Barnes guilty as charged. The trial court sentenced Barnes to concurrent executed terms of forty years each. This appeal ensued. Additional facts will be provided as necessary.

## Discussion and Decision

[12] Barnes challenges the trial court's admission of Back's testimony that B.B showed no signs of coaching during her interview. "A trial court has broad discretion in ruling on the admissibility of evidence" and we will reverse its ruling only upon an abuse of that discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012). "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it." *Id*.

[13] Indiana Evidence Rule 704(b) provides, "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of

allegations; whether a witness has testified truthfully; or legal conclusions." In general, expert testimony that a child did not exhibit any signs of coaching constitutes improper vouching for the alleged victim's credibility in violation of Evidence Rule 704(b). *Sampson v. State*, 38 N.E.3d 985, 989-92 (Ind. 2015); *Hoglund*, 962 N.E.2d at 1237. However, expert testimony about the signs of coaching and whether a child exhibited such signs is permissible "provided the defendant has opened the door to such testimony." *Sampson*, 38 N.E.2d at 992. "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible." *Id*. at n.4; *see also Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009) ("The door may be opened when the trier of fact has been left with a false or misleading impression of the facts."). Thus, "'once a child's credibility is called into question proper expert testimony may be appropriate.'" *Sampson*, 38 N.E.3d at 992 (quoting *Steward v. State*, 652 N.E.2d 490, 499 (Ind. 1995)). Here, Barnes contends that the trial court erred in finding that he opened the door to Back's testimony.

[14] Back was not included on the State's final witness list but Barbara Vernon was. Vernon had not interviewed B.B., but she was expected to testify during the State's case-in-chief "concerning characteristics, mannerisms, and behaviors common among child abuse victims" and "in rebuttal concerning the presence or absence of signs of coaching." Tr. Vol. 2 at 201. At trial, Barnes made an oral motion in limine regarding Vernon's testimony. A lengthy debate followed

outside the jury's presence.   Defense counsel argued that Vernon's testimony constituted improper vouching for B.B. in violation of Evidence Rule 704(b) and "the evidence in the trial so far ha[d] not been an attack on [her] credibility." *Id.* at 205. The prosecutor responded that defense counsel was going to stand before the jury during closing argument and

> talk about [B.B.'s] testimony and talk about her behaviors and talk about the number of times she was … interviewed by different people, and [she is] a confused little child who is simply parodying or mimicking information that she has heard either from her mother or from the doctor or from whomever, … and we are entitled to … address those potential issues.

*Id.* at 208.

[15]  As the discussion continued, defense counsel stated,

> [T]he theory of the case is that … B.B. was subjected to multiple sets of questioning at the hands of inexpert interviewers and that that is a … source or explanation for her testimony.  … If the court determines that that is an attack on her credibility, then I cannot in all good conscience say that I'm not going to be attacking her credibility.

*Id.* at 211.

[16]  The prosecutor argued that the defense's theory of the case constituted implicit coaching, which opened the door to testimony regarding whether B.B. was coached.  Although the trial court ruled that Vernon would be permitted to testify, the prosecutor stated that he wished to call Back to testify specifically

about her interview with B.B. The trial court agreed that "that door is going to be opened" and ruled that "the State can present evidence about the signs of coaching and whether or not [B.B] exhibited such signs." *Id*. at 213. Defense counsel objected to Back's testimony, arguing that his theory that the circumstances of B.B.'s questioning gave rise to her account was not the same as coaching. He also argued that the issue had not been presented for litigation at that point, as "[n]either side had elicited any evidence of coaching." *Id*. at 214, 218. Ultimately, the trial court ruled that Back would be permitted to testify. *Id*. at 219.

[17] Barnes contends that he did not open the door to Back's coaching testimony because at that point in the trial he had not questioned any witnesses in a manner that suggested B.B. had been coached or that had called her credibility into question. The State counters that Back's testimony was permissible to "rebut Barnes' claim that B.B. was coached by adults asking her leading questions and giving their own account of the molestation in her presence." Appellee's Br. at 8. We must agree with Barnes. Before the motion in limine was made, the jury had heard the testimony of B.B.'s mother, B.B., her brothers, the police officer who responded to the initial report of child molestation, two detectives, and the child abuse pediatrician who was on call at the children's hospital when B.B. was admitted. However, the State does not cite to any portion of the transcript preceding the motion of limine that shows evidence of coaching or that B.B.'s credibility was called into question. The State relies solely on the content of defense counsel's closing argument. The

potential substance of closing argument does not open the door to otherwise impermissible evidence.[1] When Back testified, no evidence regarding whether B.B. had been told what to say or calling her credibility into question had been introduced. Simply put, there was no evidence to rebut. *See Norris v. State*, 53 N.E.3d 512, 524 (Ind. Ct. App. 2016) (concluding that trial court abused its discretion in admitting testimony that victim demonstrated indicia of reliability during interview where testimony was "neither in response to defense questioning, nor to rebut an express claim that victim had been coached."); *Hamilton v. State*, 43 N.E.3d 628, 633 (Ind. Ct. App. 2015) (concluding that defendant had not opened door to coaching testimony where defense counsel had asked two alleged victims whether anyone had told them what to say in court and both victims said no and no other evidence of alleged coaching was presented), *aff'd on reh'g*, 49 N.E.3d 554 (2015), *trans. denied* (2016). Accordingly, the trial court abused its discretion in permitting Back to testify that she did not observe any signs of coaching.

[18] However, "'[e]rrors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *Norris*, 53 N.E.3d at 524-25 (quoting *Hubbell v. State*, 754 N.E.2d 884, 890 (Ind. 2001)). "The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing

---

[1] As such, we need not decide whether the concept of coaching an alleged child victim is broad enough to encompass the possibility of unintentionally suggestive circumstances surrounding the reporting and questioning of the victim.

court there is no substantial likelihood the challenged evidence contributed to the conviction." *Hoglund*, 962 N.E.2d at 1238.

[19] Barnes asserts that his convictions rest primarily on B.B.'s credibility and that "[e]vidence supporting the credibility of a witness cannot be said to be harmless when the conviction rested primarily on the credibility of the witness." Appellant's Br. at 13 (citing *Hamilton*, 49 N.E.3d at 556). Here, however, there was more than B.B.'s testimony to support Barnes's convictions. Significantly, two of the external genital swabs from B.B.'s sexual assault kit contained Barnes's sperm cells.[2] He contends that he presented a plausible alternative explanation for the presence of his semen; namely, that he used B.B.'s underwear to wipe himself after masturbating on February 22. However, the State presented expert testimony that given the quality of the DNA sample, it was unlikely that his sperm was transferred onto B.B. from a different material. Tr. Vol. 3 at 45-46, 64. In addition, B.B. testified consistently regarding the molestations. Tr. Vol. 2 at 62-80. Certain details of B.B.'s account were corroborated by her younger brother and were contrary to Barnes's claims. For example, her younger brother testified that when he and B.B. were playing Xbox on February 21, Barnes called B.B. to come to his bedroom. *Id*. at 62, 105. He also testified that while Barnes and B.B. were in the bedroom, the door was completely closed and he knocked on the door and asked if B.B. could

---

[2] The State asserts that seminal material was found on several swabs "from the inside" and outside of B.B.'s vagina. Appellee's Br. at 12. While preliminary testing of the vaginal swabs indicated that seminal material "might" be present, subsequent testing on all four of the vaginal swabs was negative for sperm cells. Tr. Vol. 3 at 42.

play. *Id*. at 71, 106. Further, Barnes's testimony contradicted what he told investigators after B.B. reported the molestations. Barnes testified that on Sunday, he was watching the race and did not see B.B. come out of the shower, but he told police that the children "come out of the bathroom to the bedroom. We go in there. I make sure they're good and dry and they get their clothes on." Tr. Vol. 3 at 105-06. We conclude that there was substantial independent evidence of guilt supporting Barnes's convictions such that Back's testimony did not likely have a substantial influence on the verdict. *See Hoglund*, 962 N.E.2d at 1238 (concluding that admission of vouching testimony was harmless where victim "testified at length concerning what happened to her" and "her testimony remained consistent and unshaken under aggressive cross-examination.").

[20] Affirmed.

Baker, J., and Barnes, J., concur.